WILLIAM A. BROWN, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3947–62, 2050–63, 2562–63, Filed January 18, 1967. 2659–63—2661–63.

[1] Cases of the following petitioners are consolidated herewith : Robert E. Owens, Jr., and Elizabeth D. Owens, docket No. 2050–63 ; Joseph H. Ferrill and Margaret Ferrill, docket No. 2562–63 ; Frank H. Abbott and Dorothy G. Abbott, docket No. 2659–63 ; Grady C. Dixon and Joyce S. Dixon, docket No. 2660–63 ; and Alfred C. Brandon, Jr., and Louise M. Brandon, docket No. 2661–63.

*R. Monroe Schwartz*, for the petitioners.
*Vallie C. Brooks*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in the petitioners' income taxes as follows:

| Docket No. | Petitioner | Taxable year | Deficiency | Addition to tax sec. 6653(a), I.R.C. 1954 |
|---|---|---|---|---|
| 3947-62 | William A. Brown | 1960 | $558.22 | |
| 2050-63 | Robert E. Owens, Jr., and Elizabeth D. Owens | 1960 | 526.01 | |
| 2562-63 | Joseph H. Ferrill and Margaret Ferrill | 1961 | 946.76 | $47.33 |
| 2659-63 | Frank H. Abbott and Dorothy G. Abbott | 1960 | 998.49 | 49.93 |
| 2660-63 | Grady C. Dixon and Joyce S. Dixon | 1960 | 929.71 | 26.09 |
| 2661-63 | Alfred C. Brandon, Jr., and Louise M. Brandon | 1960 | 365.51 | 18.28 |
| | | 1961 | 1,263.41 | 63.18 |

The respondent having conceded error with respect to one of the issues in docket No. 2659-63, the only issues remaining for decision herein are: (1) Whether strike benefit payments received by the petitioners during the taxable years in issue are includable in their gross income, and (2) whether the petitioners in docket Nos. 2562-63, 2659-63, 2660-63, and 2661-63 are liable for additions to tax for the taxable years in issue on account of negligence or intentional disregard of rules and regulations.

## FINDINGS OF FACT

Some of the facts have been stipulated and the stipulations are incorporated herein by this reference.

All of the petitioners filed their Federal income tax returns for the taxable years involved herein with the district director of internal revenue, Nashville, Tenn. The female petitioners are parties herein only because they filed joint returns with their husbands, and the male petitioners will hereinafter be referred to as the petitioners.

During the years 1960 and 1961 the petitioners were employed as airline pilots by Southern Airways, Inc., a regularly scheduled com-

mercial airline (hereinafter referred to as Southern) and were based in Memphis, Tenn.

The certified collective bargaining representative at Southern is the Air Line Pilots Association (hereinafter referred to as ALPA). ALPA is a nonprofit, employee-representing association with its home office located at Chicago, Ill., and is affiliated with the American Federation of Labor-Congress of Industrial Organizations. Some of ALPA's objectives, as set forth in its constitution, are to establish and exercise the right of collective bargaining for the purpose of making and maintaining employment agreements covering rates of pay and working conditions for its members, and to generally safeguard the rights, individually and collectively, of its members. ALPA consists of a Pilots Division and a Steward and Stewardesses Division, each of which divisions is fiscally separate, self-sustaining, and makes and implements its separate policies.

The administrative structure of ALPA consists of a board of directors, an executive committee, an executive board, master executive councils, local councils, and local executive councils. The board of directors is the highest governing body of ALPA and is vested with the general management and conduct of its business affairs. It is composed of high officials from all of the local councils. The executive committee and the executive board are responsible for the implementation of the policies announced by the directors. A master executive council is formed for each airline represented by ALPA, and functions as a coordinating council for the membership of that airline. Local councils of ALPA are established in various cities for each airline when a majority of all flight deck operating crew members employed on such airline in a particular city are active members of ALPA in good standing. Each local council has a local executive council which is responsible for the proper management of the business of the local council.

In June 1960 the Southern pilots had two local councils: Council 112 in Atlanta and council 74 in Memphis. These two local councils were controlled by the master executive council for Southern. During the years 1960 and 1961 each of the petitioners, with the exception of William A. Brown, was an active member of the Memphis local council 74 of ALPA. Brown was an apprentice member of such council. An active member of ALPA is any pilot who has completed a required 1-year probationary period with his company and is voted into the organization by the active members of the local council. Such members accept and agree to abide by the constitution and bylaws of ALPA. An apprentice member is any pilot who possesses all of the requirements for active membership with the exception of having completed the required probationary period.

Dues are paid by active members only. The amount thereof is, at the election of the member, either a percentage of his annual airline income for the previous year or a flat rate based on his flight status. Apprentice members do not pay dues and do not assume any financial obligations to ALPA. They are excluded from rights and privileges of the association. They may attend local council meetings, but may not vote.

The constitution of ALPA provides that any member may be fined, suspended, or expelled, for, among other things, disobeying or failing to comply with a decision of the board of directors, the executive board, the executive committee, the master executive council, or the local council, or for refusing or willfully neglecting to pay dues, assessments, fines, or financial obligations to ALPA.

The policy manual of ALPA specifically provides that any member who participates in strikebreaking by actually flying the planes of an airline involved in a strike shall be automatically expelled from membership. The policy manual of ALPA, as adopted by its governing bodies, provides for the payment of strike benefit assistance to all pilots (when certified by the local executive council), whether members, nonmembers, or apprentice members, who are deprived of airline income due to (a) being involved in processing a properly authorized strike; (b) a furlough or lockout by management arising directly from ALPA's efforts to resolve a dispute; or (c) the implementation of ALPA policy by a group of members or by ALPA. Payment of strike benefits to striking pilots is contingent upon their refraining from flying for the airline involved in a strike and upon their active support of the strike effort, through performance of any duties, including picketing, which may be assigned by local leadership.

Dues paid to ALPA cover its normal operating expenses, but do not include any amount for emergency programs, such as strike benefit assistance. Financial assistance for members who may be involved in a properly authorized strike is provided through the levying of special assessments on all members of ALPA. A strike assessment must be approved by the board of directors. The amount of each member's obligation for a strike assessment is determined by ALPA and is based on a percentage of the member's dues for the preceding calendar year. A member of ALPA may decline to pay any assessment made by ALPA at any time, in which event he would forfeit his membership in ALPA, but such loss of membership would generally have no effect on his employment status with his particular airline employer. Local council 74 did not maintain any fund for strike benefit assistance.

In 1960 Southern's pilots voted to strike the company following a dispute over work rules and wages, and the ALPA board of directors voted to pay strike benefits to them in the event a strike took place. Subsequently, on June 5, 1960, the petitioners, together with all of the

other airline pilots of Southern, with the possible exception of one or two pilots holding management positions, went out on strike against Southern. The strike was authorized by the master executive council of Southern and approved by ALPA's president in accordance with the provisions of the ALPA constitution.

The chairman of the local executive council for Memphis council 74 certified the petitioners and other Southern strikers in the Memphis area for strike benefits in advance of payment. The chairman did not require the performance by the striking pilots of any picketing or related duties, but all of such pilots, including all of the petitioners, were required to withhold their services from, and refrain from flying for, Southern during the strike in order to receive strike benefit payments from ALPA. During the first 117 days of the strike, Southern was completely grounded in Memphis, and did not operate any flights in and out of Memphis during such period. However, after such period Southern began to operate flights in and out of Memphis, and the striking pilots were polled to determine what each felt he was best qualified to do to help the strike effort and keep Southern from flying. As a result of such poll, various pilots did various duties in aid of the strike effort, including picketing.

In August 1960 ALPA entered into an agreement with Valparaiso Aero Service, Inc., for the operation of an airline known as Superior Air Lines, during the strike to compete with Southern over Southern's most lucrative routes in order to take business from Southern and advance the strike effort. Under the agreement ALPA was to furnish the personnel, including pilots. Some of the striking Southern pilots contributed their services to Superior as part of the strike effort, receiving no compensation other than meals and out-of-pocket expenses. Superior's operations ceased about November 1962, having resulted in losses in excess of $100,000 which were sustained by ALPA pursuant to its guarantee given to Valparaiso. The strike benefits paid to the petitioners herein and to other Southern strikers were not affected by the fact that they did or did not act as pilots for Superior.

ALPA imposed no requirement that strikers prove monetary need in order to receive such benefits, nor were any food vouchers distributed or personal obligations of strikers paid by ALPA. The policy manual provided that strike benefits were not subject to setoff against other earnings except for earnings from approved activity with the affected carrier during the shutdown.

During a part of the strike period petitioner Brandon obtained work as a flying instructor and operated an air charter service, and petitioners Dixon and Ferrill jointly operated a hardware and sporting-goods store. In accordance with the provisions of the ALPA policy manual the strike benefits received by them were not reduced on

account thereof. During the course of the strike the petitioner Abbott returned to college, but continued to receive strike benefits.

At the biennial meeting of the board of directors of ALPA in June 1962, a resolution was adopted to continue paying strike benefits to the Southern pilots until 2 months after they returned to work and were placed on Southern's payroll. The resolution stated, in part, as follows:

WHEREAS the Southern strike and its attendant problems appears to be drawing to a conclusion in a manner favorable to ALPA and to the Southern pilots, and

WHEREAS there still has been no "back to work" contract negotiated, and

WHEREAS an orderly and smooth return of ALPA pilots to Southern cockpits may take time and may not be done "en masse," and

WHEREAS the long and orderly strike of the Southern pilots has contributed future value to all air line pilots in all future negotiations,

THEREFORE BE IT RESOLVED this Board of Directors extend its congratulations to these men and to strengthen their resolve in this matter, and

BE IT FURTHER RESOLVED that in accordance with present ALPA policy on an individual basis the Southern MEC be empowered to continue payments for two months after return to work—return to work will be the date the pilot is placed on the payroll, and

BE IT FURTHER RESOLVED that the ALPA publicly extend its heartfelt thanks and respect to these members for their strong and firm stand for the beliefs of ALPA.

The ALPA strike against Southern was terminated on September 21, 1962, but due to the length of the strike the striking pilots were required to requalify as pilots under Federal Aviation Agency regulations, so that there was a period of from 2 to 4 months following the conclusion of the strike before the petitioners were able to requalify as pilots and thereby become eligible to be placed on flight-pay status. Accordingly, as a result of the above ALPA resolution and the requalification requirements, the petitioners Abbott, Dixon, and Ferrill continued to receive strike benefits until January 1963, while the petitioners Brandon, Brown, and Owens received such benefits until March 1963.

After each petitioner returned to flight-pay status, he, along with other Southern pilots who were members of ALPA and who had returned to flight-pay status (including the petitioner William A. Brown who became an active member of ALPA at the termination of the strike), was assessed by ALPA for benefits payable to other Southern pilots who had not yet returned to flight-pay status with Southern.[2] The funds from which strike benefits were paid to the petitioners and other striking Southern pilots consisted of amounts

---

[2] During their strike against Southern, the petitioners (with the exception of William A. Brown) were assessed for benefits payable to pilots of Northwest Airlines, Inc., who were furloughed by said airline during 1960 and 1961 because of a dispute between Northwest Airlines and the International Association of Machinists, but payment of these assessments was deferred until the petitioners had returned to flight-pay status.

paid by ALPA member pilots of other airlines who were not engaged in any work stoppage, pursuant to assessments made against them by ALPA. Upon termination of the strike at Southern, surplus funds in possession of ALPA from assessments for strike benefits in connection with the strike were refunded to contributing members.

The strike benefit payments made by ALPA to each of the petitioners were made pursuant to an established schedule or formula set forth in the ALPA policy manual, based upon the recipient's preceding year's airline income, with certain maximum and minimum limitations. Under the provisions in existence at June 5, 1960, the benefits were payable beginning with the 8th day of the strike.

The following tabulation shows the annual salaries of the petitioners from Southern just prior to the strike and the amounts of strike benefits paid to them in cash by ALPA during the period June 5, 1960, to December 31, 1960, and during the entire year 1961:

| | Annual salary prior to strike | Strike benefits paid in 1960 | Strike benefits paid in 1961 |
|---|---|---|---|
| William A. Brown | $4,800 | $2,561.33 | |
| Robert E. Owens, Jr | 6,600 | 2,538.07 | |
| Joseph H. Ferrill | 11,000 | | $7,511.04 |
| Frank H. Abbott | 13,500 | 4,548.42 | |
| Grady C. Dixon | 13,500 | 4,411.35 | |
| Alfred C. Brandon, Jr | 11,000 | 2,415.27 | 5,910.90 |

Prior to filing their income tax returns for the taxable year 1960 the striking Southern pilots attempted to obtain information as to the taxability of the strike benefits. One of them, C.A. Stokes (not a petitioner herein) who was by education an attorney, requested the advice of J. R. Goldthwait, Jr., an Atlanta attorney. On February 16, 1961, Goldthwait sent a letter to Stokes advising him that in view of certain cited court decisions involving strike benefits and the action of the Government with regard thereto, it was his opinion that the striking pilots would be justified in taking the position that strike benefits are nontaxable and should not be reported as income. Copies of such letter were circulated by Stokes to all striking pilots of Southern.

On November 1, 1961, Maurice B. Wigderson, an attorney on ALPA's legal staff, addressed a letter to V. A. Knudegard, the master executive council chairman for Southern, advising him, in answer to his inquiry, that in his opinion the strike benefits received by the Southern pilots constituted gifts. Such opinion was made available to all Southern pilots.

The petitioners did not report any of the strike benefits received from ALPA in 1960 and 1961 on their Federal income tax returns for such years. In the notices of deficiency, the respondent included the above amounts in the petitioners' adjusted gross incomes, with the

statement that the strike benefit payments from ALPA are taxable as ordinary income under section 61 of the Internal Revenue Code of 1954.

The strike benefits received by the petitioners in the taxable years 1960 and 1961 did not constitute gifts.

In the notices of deficiency sent to the petitioners in docket Nos. 2562–63, 2659–63, 2660–63, and 2661–63, the respondent determined additions to tax under section 6653(a) of the Code, on the ground that parts of the underpayments of tax determined for the taxable years 1960 and 1961 were due to negligence or intentional disregard of rules and regulations.

No part of any underpayment in tax determined by the respondent in docket Nos. 2562–63, 2659–63, 2660–63, and 2661–63 was due to negligence or intentional disregard of rules and regulations.

OPINION

The petitioners contend that the strike benefit payments received by them do not constitute income within the meaning of the 16th amendment to the United States Constitution and the definition of gross income contained in section 61(a) of the Internal Revenue Code of 1954.[3] Alternatively, they contend that the strike benefit payments constituted gifts within the meaning of section 102 of the Code, and are therefore not includable in gross income.[4]

The respondent, on the other hand, maintains that the strike benefit payments received by the petitioners are properly includable in gross income under section 61(a) of the Code, and that they are not excludable from gross income as gifts.

The petitioners' principal reliance is upon the definition of income contained in *Eisner* v. *Macomber*, 252 U.S. 189, namely, " 'the gain derived from capital, from labor, or from both combined,' provided it be understood to include profit gained through a sale or conversion of capital assets." It appears to be the petitioners' contention that the strike benefits received did not derive from any of these enumerated sources. They claim that ALPA did not require them to picket or perform any other duties in order to receive these strike benefits.

---

[3] The 16th amendment provides:

The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration.

Sec. 61(a) provides in part as follows:

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

(1) Compensation for services, including fees, commissions, and similar items;

(2) Gross income derived from business;

[4] Sec. 102(a) of the Code provides:

(a) GENERAL RULE.—Gross income does not include the value of property acquired by gift, bequest, devise, or inheritance.

While the chairman of the local executive council testified that he did not require the performance by the striking pilots of any picketing or related duties in connection with this strike, the record establishes that ALPA had the authority to require the performance of such services as a condition to the payment of strike benefits, and the evidence shows that the pilots were polled to determine what they were best qualified to do to help the strike effort, as a result of which many of them did picket and perform other duties, including flying for an airline set up by ALPA in competition with Southern. It is also clear from the evidence that a minimum requirement for receiving the strike benefits was that the pilots refrain from flying Southern's planes. It is well established that compensation from refraining from labor is taxable income no less than compensation for services to be performed. *Salvage* v. *Commissioner* (C.A. 2) 76 F. 2d 112, affd. 297 U.S. 106. See also *John N. Hagar*, 43 T.C. 468.

Furthermore, in *Commissioner* v. *Glenshaw Glass Co.*, 348 U.S. 426, the Supreme Court held that Congress, in providing in section 22(a) of the Internal Revenue Code of 1939 that gross income includes "gains or profits and income derived from any source whatever" intended to exert the full measure of its power to tax income. The Court further stated that the definition of gross income contained in *Eisner* v. *Macomber, supra*, "was not meant to provide a touchstone to all future gross income questions." In the *Glenshaw Glass* case the Court, in holding that punitive damages received for fraud and antitrust violations constituted gross income, pointed out that there were "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." See also *Gen. Investors Co.* v. *Commissioner*, 348 U.S. 434. The petitioners herein, by receiving the strike benefits, realized accessions to wealth which they were free to use as they saw fit, and we think there can be no question that such benefits constituted income within the meaning of the Constitution, and also within the meaning of section 61(a)[5] of the Code unless, as contended by the petitioners, the benefits constituted gifts which are specifically excluded from gross income by the provisions of section 102(a) of the Code.

In *Commissioner* v. *Duberstein*, 363 U.S. 278, the Supreme Court stated that the question of whether an amount received constitutes a gift within the meaning of the statute is basically one of fact, stating in part:

> The course of decision here makes it plain that the statute does not use the term "gift" in the common-law sense, but in a more colloquial sense. This Court

---

[5] While the language of sec. 61(a) of the Internal Revenue Code of 1954 differs slightly from that of sec. 22(a) of the Internal Revenue Code of 1939, Congress made it clear that such change did not affect the all-inclusive nature of statutory gross income; that the definition of gross income was based upon the 16th amendment to the Constitution; and that the word "income" was used in its constitutional sense. See H. Rept. No. 1337, 83d Cong., 2d Sess., p. A18.

has indicated that a voluntary executed transfer of his property by one to another, without any consideration or compensation therefor, though a common-law gift, is not necessarily a "gift" within the meaning of the statute. For the Court has shown that the mere absence of a legal or moral obligation to make such a payment does not establish that it is a gift. *Old Colony Trust Co.* v. *Commissioner*, 279 U.S. 716. And, importantly, if the payment proceeds primarily from "the constraining force of any moral or legal duty," or from "the incentive of anticipated benefit" of an economic nature, *Bogardus* v. *Commissioner*, 302 U.S. 34, 41, it is not a gift. And, conversely, "[w]here the payment is in return for services rendered, it is irrelevant that the donor derives no economic benefit from it." *Robertson* v. *United States*, 343 U.S. 711, 714.[7] A gift in the statutory sense, on the other hand, proceeds from a "detached and disinterested generosity," *Commissioner* v. *LoBue*, 351 U.S. 243, 246; "out of affection, respect, admiration, charity or like impulses." *Robertson* v. *United States, supra*, at 714. And in this regard, the most critical consideration, as the Court was agreed in the leading case here, is the transferor's "intention." *Bogardus* v. *Commissioner*, 302 U.S. 34, 43. "What controls is the intention with which payment, however voluntary, has been made." [Footnote omitted.]

The strike benefits paid by ALPA to the petitioners herein did not proceed from a detached and disinterested generosity or out of charity or like impulses. The benefits paid to the individual pilots were not conditioned upon need, but were paid pursuant to an established schedule or formula based upon the recipient's preceding year's airline income. Such payments were made in furtherance of the objectives of ALPA, namely, to obtain anticipated economic benefits for all its pilot members. As pointed out hereinabove, there was consideration given by the striking pilots—a minimum requirement for receipt of the benefits was that the recipient refrain from flying Southern's airplanes. It would also seem that ALPA had at least a moral obligation to pay the strike benefits to the petitioners as the result of the action of its board of directors in voting, prior to the strike, to pay such benefits if the strike was carried out. Under the circumstances, we are constrained to conclude that the benefits in question are not excludable from gross income as gifts. We note that in *Godwin* v. *United States*, (W.D. Tenn. Dec. 15, 1964) —— F. Supp. ——, the court directed a verdict that strike benefits received from ALPA by a Southern pilot in connection with this same strike were income rather than gifts. See also *Woody* v. *United States* (C.A. 9) 368 F. 2d 668, affirming (D. Oreg.) —— F. Supp. ——; *John N. Hagar, supra;* and *Halsor* v. *Lethert*, (D. Minn.) 240 F. Supp. 738, in which it was held that under the circumstances there involved strike benefits constituted taxable income.

In *United States* v. *Kaiser*, 363 U.S. 299, the Supreme Court held that a jury had acted within its competence in finding that certain payments made by a labor union to a striker constituted gifts. The Court again emphasized the basically factual nature of the question. There the taxpayer went out on strike and found himself in financial need. He was not a union member but went to the union headquarters

and requested assistance. It was the policy of the union to grant assistance to the strikers simply on a need basis, whether or not the striker was a union member, and to cease giving assistance to strikers who obtained work. The union representatives questioned the taxpayer as to his financial resources and his dependents. The taxpayer had no other job and needed assistance with respect to the essentials of life. The union provided him with a food voucher for $6 per week (later increased to $7.50 per week), redeemable in kind at a local store, and also paid his room rent amounting to $9 per week. The Supreme Court there stated in part:

Our opinion in *Duberstein* stresses the basically factual nature of the inquiry as to this issue. The factual inferences to be drawn from the basic facts were here for the jury. They had the power to conclude, on the record, taking into account such factors as the form and amount of the assistance and the conditions of personal need, of lack of other sources of income, compensation, or public assistance, and of dependency status, which surrounded the program under which it was rendered, that while the assistance was furnished only to strikers, it was not a recompense for striking. They could have concluded that the very general language of the Union's constitution, when considered with the nature of the Union as an entity and with the factors to which we have just referred, did not indicate that basically the assistance proceeded from any constraint of moral or legal obligation, of a nature that would preclude it from being a gift. And on all these circumstances, the jury could have concluded that assistance, rendered as it was to a class of persons in the community in economic need, proceeded primarily from generosity or charity, rather than from the incentive of anticipated economic benefit. * * *

Suffice it to state that the situation in the instant case is significantly different from that obtaining in the *Kaiser* case. There the assistance was given because of the recipient's needs and was earmarked for the payment of his essentials of life, namely, food and rent. Here the payments were made irrespective of need and irrespective of other sources of income, and without any restrictions as to use.

The respondent also contends that the petitioners in docket Nos. 2562–63, 2659–63, 2660–63, and 2661–63 are liable for additions to tax for the taxable years in issue under section 6653(a) of the Code,[6] on account of negligence or intentional disregard of rules and regulations in failing to report strike benefits received as income.[7]

Prior to filing their returns for the taxable years 1960 and 1961, the striking Southern pilots attempted to obtain information as to the

[6] Sec. 6653(a) provides:

NEGLIGENCE OR INTENTIONAL DISREGARD OF RULES AND REGULATIONS WITH RESPECT TO INCOME OR GIFT TAXES.—If any part of any underpayment (as defined in subsection (c)·(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.

[7] On brief the respondent states that his failure to determine sec. 6653(a) additions to tax against the petitioners in docket Nos. 3947–62 and 2050–63 was due to an oversight. The respondent chose not to raise this issue affirmatively at the trial with respect to the above two docket numbers.

taxability of the strike benefits. As the result of the solicitation of one of their members they, including the petitioners, were in receipt of a letter from an attorney in which he expressed the opinion that, in view of certain court decisions involving strike benefits and the action of the Government with regard thereto, they would be justified in taking the position that strike benefits are nontaxable and need not be reported as income. The opinion letter itself would indicate to the reader that the attorney rendering the opinion was familiar with the factual situation involved and with the then existing cases dealing with the taxability of strike benefits. While, as indicated hereinabove, we are in disagreement with the legal opinion upon which the petitioners relied, we cannot conclude that their reliance thereon was unreasonable. Under the circumstances, it is our conclusion that any underpayment of tax due to failure to report the strike benefits as taxable income was not due to negligence or intentional disregard of rules and regulations, within the intendment of section 6653(a). We accordingly hold that the petitioners are not liable for additions to tax under such section.[8]

> *Decisions will be entered for the Respondent in docket Nos. 3947–62 and 2050–63.*
>
> *Decisions will be entered for the Respondent in docket Nos. 2562–63, 2660–63, and 2661–63, except to the extent he determined additions to the tax under section 6653(a).*
>
> *Decision will be entered under Rule 50 in docket No. 2659–63.*

---

[8] We note that in *Godwin* v. *United States* an addition to tax under sec. 6653(a) was approved upon the finding of the jury that the taxpayer was negligent in failing to include the strike benefits on his income tax return. However, upon the basis of the evidence presented in the instant case, we are satisfied that the underpayments resulting from failure to include the strike benefits as income were not due to negligence or intentional disregard of rules and regulations.