PAUL V. HORNUNG, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3740–64.   Filed January 27, 1967.

*Michael J. Clare*, for the petitioner.
*Sanford S. Newman* and *S. Earl Heilman*, for the respondent.

HOYT, *Judge:* Respondent determined an income tax deficiency against petitioner in the amount of $3,163.76 for the taxable year 1962. Petitioner having conceded an issue relating to a travel expense deduction, the questions remaining for decision are:

(1) Whether the value of a 1962 Corvette automobile which was won by petitioner for his performance in a professional football game should be included in his gross income for the taxable year 1962.

(2) Whether the value of the use of 1962 Thunderbird automobiles furnished to the petitioner by the Ford Motor Co. should be included in his gross income for the taxable year 1962.

(3) Whether petitioner's gross income for 1962 should include the value of a fur stole received by petitioner's mother from his employer.

### FINDINGS OF FACT

The stipulated facts are found accordingly and adopted as our findings.

Petitioner is a cash basis taxpayer residing in Louisville, Ky. For the taxable year 1962, petitioner filed his Federal individual income tax return (Form 1040) with the district director of internal revenue, Louisville, Ky. Petitioner is a well-known professional football player who was employed by the Green Bay Packers in 1962. Prior to becoming a professional, petitioner attended the University of Notre Dame and was an All-American quarterback on the university football team.

### Issue 1. The Corvette

Sport Magazine is a publication of the McFadden-Bartell Corp., with business offices in New York City. Each year Sport Magazine (hereinafter sometimes referred to as Sport or the magazine) awards a new Corvette automobile to the player selected by its editors (primarily by its editor in chief) as the outstanding player in the National Football League championship game. This award was won by John Unitas of the Baltimore Colts in 1958 and 1959 and by Norm Van Brocklin of the Philadelphia Eagles in 1960. A similar annual award is made to outstanding professional athletes in baseball, hockey, and basketball. The existence of the award is announced several days prior to the sporting event in question, and the selection and announcement of the winner is made immediately following the athletic contest. The Corvette automobiles are generally presented to the recipients at a luncheon or dinner several days subsequent to the sporting

event and a photograph of the athlete receiving the car is published in the magazine, together with an article relating to his performance during the particular athletic event. The Corvette awards are intended to promote the sale of Sport Magazine and their cost is deducted by the publisher for Federal income tax purposes as promotion and advertising expense.

The Corvette which is to be awarded to the most valuable player in the National Football League championship game is generally purchased by the magazine several months prior to the date the game is played, and it is held by a New York area Chevrolet dealer until delivered to the recipient of the award. In some years when the game is played in New York the magazine has had the car on display at the stadium on the day of the game.

On December 31, 1961, petitioner played in the National Football League championship game between the Green Bay Packers and the New York Giants. The game was played in Green Bay, Wis. Petitioner scored a total of 19 points during this game and thereby established a new league record. At the end of this game petitioner was selected by the editors of Sport as the most valuable player and winner of the Corvette, and press releases were issued announcing the award. At approximately 4:30 on the afternoon of December 31, 1961, following the game, the editor in chief of Sport informed petitioner that he had been selected as the most valuable player of the game. The editor in chief did not have the key or the title to the Corvette with him in Green Bay and petitioner did not request or demand immediate possession of the car at that time but he accepted the award.

The Corvette which was to be awarded in connection with this 1961 championship game had been purchased by Sport in September of 1961. However, since the game was played in Green Bay, Wis., the car was not on display at the stadium on the day of the game, but was in New York in the hands of a Chevrolet dealership. As far as Sport was concerned the car was "available" to petitioner on December 31, 1961, as soon as the award was announced. However, December 31, 1961, was a Sunday and the New York dealership at which the car was located was closed. Although the National Football League championship game is always played on a Sunday, Sport is prepared to make prior arrangements to have the car available in New York for the recipient of the award on that Sunday afternoon if the circumstances appear to warrant such arrangements—particularly if the game is played in New York. Such arrangements were not made in 1961 because the game was played in Green Bay, and, in the words of Sport's editor in chief, "it seemed a hundred-to-one that * * * [the recipient of the award] would want to come in [to New York] on New Year's Eve to take possession" of the prize.

On December 31, 1961, when petitioner was informed that he had won the Corvette, he was also informed that a luncheon was to be held for him in New York City on the following Wednesday by the publisher of Sport, at which luncheon his award would be presented. At that time petitioner consented to attend the luncheon in order to receive the Corvette. There was no discussion that he would obtain the car prior to the presentation ceremony previously announced. The lunch was held as scheduled on Wednesday, January 3, 1962, in a New York restaurant. Petitioner attended and was photographed during the course of the presentation of the automobile to him. A photograph of petitioner sitting in the car outside of the restaurant was published in the April 1962 issue of Sport, together with an article regarding his achievements in the championship game and the Corvette prize award. Petitioner was not required to attend the lunch or to pose for photographs or perform any other service for Sport as a condition or as consideration for his receipt of the car.

The fair market value of the Corvette automobile received by petitioner was $3,331.04. Petitioner reported the sale of the Corvette in his 1962 Federal income tax return in Schedule D attached thereto as a short-term gain as follows:

| Kind of property | Date acquired | Date sold | Gross sales price | Depreciation allowed | Cost | Gain |
|---|---|---|---|---|---|---|
| 1962 Corvette gift— Sport Magazine____ | 1962 | 1962 | 3,331.04 | 0.00 | 0.00 | None |

NOTE: Section 74(b) provides an exclusion from gross income any amount received as a prize or award if

(1) Such prize or award was made primarily in recognition of past achievements of the recipient in religious, charitable, scientific, educational, artistic, literary, or civic fields.

(2) Recipient was selected without any action on his part to enter the contest or proceeding.

(3) Recipient is not required to render substantial future services as a condition to receiving the prize or award.

Petitioner did not include the fair market value of this car in his gross income for 1962, or for any other year. McFadden-Bartell Corporation deducted its cost as a promotion and advertising expense.

### Issue 2. The Thunderbird

When petitioner was discharged from the Army in late July of 1962 he contacted a friend of his who had a job with Ford Motor Co. and asked if the friend could arrange to provide a car for petitioner to drive while in Green Bay.[1] During 1962 the Ford Motor Co. through

---

[1] Petitioner had sold his prize Corvette in Kansas City 4 or 5 months after he received it.

a dealership in Green Bay furnished petitioner a 1962 Thunderbird automobile. Title to this car was retained by Ford, and the automobile was replaced with a new one after a few months. Petitioner drove the two successive Thunderbirds a total of approximately 3,000 miles during 1962 and paid for the insurance and all operating expenses.

When petitioner was given the Thunderbird to use he did not have any arrangement or obligation to be photographed in the car, nor was he asked to make any personal appearances at Ford dealerships or to make any special effort to be seen by the public driving the car. However, petitioner was asked if he "would come in and say hello to the kids at Milwaukee Punt, Pass and Kick Contest," a contest for children regularly sponsored by Ford Motor Co. which petitioner and "a few of the ball players" would regularly attend. The Ford Motor Co. has also furnished Thunderbirds to other members of the Packer team for their use in and around Green Bay.

Petitioner did not recognize or report gross income with respect to his use of the Thunderbirds during 1962. The fair rental value of petitioner's use of the Thunderbirds during 1962 was determined by respondent to be $600.

### Issue 3. The Mink Stole

A few days after the Packers won the title to the Western Division of the National Football League in 1961 [2] the players were informed that the Green Bay Packers, Inc., their employer, would give a fur stole to the wife, friend, or mother of each player on the team. Since petitioner was not married at the time, the Packers' head coach suggested that in his case the fur stole be given to his mother. Petitioner's mother received the fur stole before the end of 1961; she had it in her possession in Green Bay during the week prior to the championship game on December 31, 1961.

The cost of all of the fur stoles purchased by the Green Bay Packers, Inc., to be given away as described above was entered in the corporation's general journal on December 31, 1961, as "Miscellaneous Player Expense." The Green Bay Packers, Inc., employs the accrual method of accounting. No deduction was claimed by the Green Bay Packers, Inc., on its 1961 corporate income tax return for this expense. It was treated on said return under the heading "other unallowable deductions," and was described as "Awards to players' wives, etc."

The cost of these stoles to the Packers was $395 per stole, less an 8-percent discount. A total of 36 stoles were ordered and the invoices for all but 9 of these were dated subsequent to January 1, 1962. The invoice for the other 9 was dated December 29, 1961.

---

[2] We take judicial notice that this *division* title was won prior to the Dec. 31, 1961, championship game in which the Packers played the winners of the Eastern Division.

Petitioner reported no gross income in any year with respect to the receipt by his mother of the fur stole in 1961. The fur stole had a fair market value of $395.

Respondent determined that petitioner's taxable income for 1962 was understated by reason of his failure to include therein ordinary income in the amount of $4,331.04 as reflected by the fair market value of the following items:

| | |
|---|---:|
| 1962 Corvette_____ | $3,331.04 |
| Personal use of 1962 Thunderbird_____ | 600.00 |
| Fur coat_____ | 400.00 |
| Total _____ | 4,331.04 |

## ULTIMATE FINDINGS OF FACT

The dominant motive and purpose of McFadden-Bartell in awarding the Corvette to petitioner was to promote and benefit their business of publishing Sport Magazine. Petitioner has failed to carry his burden of proving that the free use of Thunderbird automobiles provided by Ford Motor Co. to petitioner in 1962 was not taxable income or that the value thereof was other than as determined by respondent.

## OPINION

### Issue 1. The Corvette

Petitioner alleged in his petition that the Corvette was received by him as a gift in 1962. However, at trial and on brief, he argues that the car was constructively received in 1961, prior to the taxable year for which the deficiency is being assessed. If this contention is upheld, the question of whether the car constituted a reportable item of gross income need not be considered. This argument is based upon the assertion that the announcement and acceptance of the award occurred at approximately 4:30 on the afternoon of December 31, 1961, following the game.

It is undisputed that petitioner was selected as the most valuable player of the National Football League championship game in Green Bay on December 31, 1961. It is also undisputed that petitioner actually received the car on January 3, 1962, in New York. Petitioner relies upon the statement at the trial by the editor in chief of Sport that as far as Sport was concerned the car was "available" to petitioner on December 31, 1961, as soon as the award was announced. It is therefore contended that the petitioner should be deemed to have received the value of the award in 1961 under the doctrine of constructive receipt.

The amount of any item of gross income is included in gross income for the taxable year in which received by the taxpayer unless such

amount is properly accounted for as of a different period. Sec. 451 (a).[3] It is further provided in section 446 (c) that the cash receipts method, which the petitioner utilized, is a permissible method of computing taxable income. The doctrine of constructive receipt is developed by regulations under section 446 (c) which provides as follows:[4]

Generally, under the cash receipts and disbursements method * * * all items which constitute gross income (whether in the form of cash, property, or services) are to be included for the taxable year in which actually or constructively received. * * *

The regulations under section 451 elaborate on the meaning of constructive receipt:[5]

Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. * * *

The probable purpose for development of the doctrine of constructive receipt was stated as follows in *Ross* v. *Commissioner*, 169 F. 2d 483, 491 (C.A. 1, 1948):

The doctrine of constructive receipt was, no doubt, conceived by the Treasury in order to prevent a taxpayer from choosing the year in which to return income merely by choosing the year in which to reduce it to possession. Thereby the Treasury may subject income to taxation when the only thing preventing its reduction to possession is the volition of the taxpayer. * * *

However, it was held in the *Ross* case, at page 496, that the doctrine of constructive receipt could be asserted by a taxpayer as a defense to a deficiency assessment even though the item in controversy had not been reported for the taxable year of the alleged constructive receipt:

if these items were constructively received when earned they cannot be treated as income in any later year, * * * and, in the absence of misstatement of fact, intentional or otherwise, the petitioner cannot be estopped from asserting that the items were taxable only in the years in which constructively received.

The basis of constructive receipt is essentially unfettered control by the recipient over the date of actual receipt. Petitioner has failed to convince us that he possessed such control on December 31, 1961, over the receipt of the Corvette. The evidence establishes that the Corvette which was presented to petitioner on January 3, 1962, was in the possession of a Chevrolet dealer in New York City on December 31, 1961. At the time the award was announced in Green Bay,

---

[3] All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.

[4] Sec. 1.446–1 (c) (1) (i), Income Tax Regs.

[5] Sec. 1.451–2 (a), Income Tax Regs.

the editor in chief of Sport had neither the title nor keys to the car, and nothing was given or presented to petitioner to evidence his ownership or right to possession of the car at that time.

Moreover, since December 31, 1961, was a Sunday, it is doubtful whether the car could have been transferred to petitioner before Monday even with the cooperation of the editor in chief of Sport. The New York dealership at which the car was located was closed. The car had not been set aside for petitioner's use and delivery was not dependent solely upon the volition of petitioner. The doctrine of constructive receipt is therefore inapplicable, and we hold that petitioner received the Corvette for income tax purposes in 1962 as he originally alleged in his petition and as he reported in his 1962 income tax return.

We now must tackle the more basic question involving the Corvette which is whether the value of the car should be included in petitioner's gross income for the taxable year of receipt. Petitioner's offensive strategy on this issue is two-pronged. He contends (1) that the car was received as a gift and therefore properly excluded from gross income under section 102(a), and (2) that the car was received as a nontaxable prize or award under section 74.[6]

It is our opinion that certainly the donor's motive here precludes a determination that Sport made a gift of the Corvette to petitioner in 1962. It is clear that there was no detached and disinterested generosity. It also seems clear that the enactment of section 74 has had the desirable effect of eliminating the theory of gift exclusions from the field of prizes and awards. The Supreme Court has stated in *Commissioner* v. *Duberstein*, 363 U.S. 278, 290 (1960), with regard to gift exclusions that:

If there is fear of undue uncertainty or overmuch litigation, Congress may make more precise its treatment of the matter by singling out certain factors and making them determinative of the matter, as it has done in one field of the "gift" exclusion's former application, that of prizes and awards.[12] [Footnote omitted.]

Petitioner undeniably received an award for his outstanding performance in the National Football League championship game. Under the provisions of section 74, gross income includes amounts received as prizes and awards unless section 117 (relating to scholarships and fellowship grants), or the exception set forth in subsection

---

[6] SEC. 74. PRIZES AND AWARDS.

(a) GENERAL RULE.—Except as provided in subsection (b) and in section 117 (relating to scholarships and fellowship grants), gross income includes amounts received as prizes and awards.

(b) EXCEPTION.—Gross income does not include amounts received as prizes and awards made primarily in recognition of religious, charitable, scientific, educational, artistic, literary, or civic achievement, but only if—

(1) the recipient was selected without any action on his part to enter the contest or proceedings; and

(2) the recipient is not required to render substantial future services as a condition to receiving the prize or award.

(b) is applicable. Therefore, petitioner is precluded from effectively arguing that the award constituted a gift, and he can only hope to score on his argument that the award qualifies as an exception under section 74(b). In making this argument, petitioner shifts into a shotgun formation, contending that his accomplishments in the championship football game constitute educational, artistic, scientific, and civic achievements within the meaning of section 74(b). We believe that petitioner should be caught behind the line of scrimmage on this particular offensive maneuver.

In construing the terms used in section 74(b), we are cognizant of the Supreme Court's recent reaffirmation of the principle that the words of revenue acts should be interpreted in their ordinary, everyday sense unless the internal structure of the statute or the legislative purpose indicates the propriety of a departure from a literal reading. See *Malat* v. *Riddell*, 383 U.S. 569 (1966). Petitioner relies primarily upon the opinions and beliefs of the editor in chief of Sport to establish the applicability of section 74(b).

In the opinion of this witness, the game of football is educational because it is taught in accredited colleges as part of certain physical education courses. Moreover, being a star football player is said to be an artistic achievement since such status "calls for a degree of artistry." Finally, since the skills of a football player are based upon techniques which encompass certain "scientific" principles,[7] it is contended that petitioner's ability to excel in the execution of these techniques is a scientific achievement worthy of recognition by means of the award presented by Sport. Petitioner also argues that the award was made in recognition of civic achievement due to the alleged interest of the President of the United States in petitioner's application for leave from the Army to allow participation in the championship game.

We believe that the words "educational," "artistic," "scientific," and "civic" as used in section 74(b) should be given their ordinary, everyday meaning in the context of defining certain types of personal achievement. Legislative history supports our belief. For example, the Senate report states that the provisions of section 74(b) are in-

---

[7] The record contains the following statements by the editor in chief of Sport describing some of the "scientific" principles of football:

"The players have large notebooks that they have at the beginning of the practice season that contain intricate plays. You have to be somewhat of a mathematician to digest them. * * *

\* \* \* \* \* \* \*

"Part of the training, at least related to football, professional football, is that the athlete must know a certain number of plays a year; must know how to play his position in many different ways; must be able to look at a film of another team and decide how to play against his particular opponent; must look at his own films and know what he has done right and what he has done wrong, and whether he has blocked off the wrong shoulder or something like that. He must know what his teammates are doing in relation to a formation, in relation to specific plays.

"This is all in the area of technique, and is quite complicated, and in a sense I think scientific."

tended to exempt from taxation such awards as the Nobel prize. See S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 178 (1954).

The legislative history of section 74 has been judicially interpreted as indicating that "only awards for genuinely meritorious achievements were to be freed from taxation." *Simmons* v. *United States*, 308 F. 2d 160, 163 (C.A. 4, 1962). It was further stated in *Simmons* that all of the types of achievements singled out in section 74(b) resemble each other in general character since "they all represent activities enhancing in one way or another the public good." This interpretation is consistent with our view that the field of activity here in question, professional football, is not an activity which is "educational," "artistic," "scientific," or "civic" in the traditional, ordinarily understood, and intended sense of these words.

We feel confident that Congress had no intention of allowing professional football to constitute a type of activity for which proficiency could be recognized with an exempt award under section 74(b). Professional football cannot be viewed as an "educational," "artistic," "scientific," or "civic" field of endeavor as those terms are used in the statute no matter how fond of the sport we may be. The crucial question for qualification under section 74(b) is the nature of the activity awarded. *Simmons* v. *United States*, 308 F. 2d 160 (C.A. 4, 1962). Had Congress intended to except prizes or awards for recognition of athletic prowess or achievement it could readily and easily have done so; as provided now however, no such exception can be read into the statutory language used. We hold that the value of the Corvette should have been included in petitioner's gross income for 1962. To hold otherwise would be a distortion of the commonly understood meaning of the words in controversy when read in the overall context of section 74.

### Issue 2. The Thunderbird

Respondent has determined that $600, the fair rental value of petitioner's successive use of two 1962 Thunderbirds furnished by the Ford Motor Co., should have been included in petitioner's 1962 gross income. Petitioner argues that the free use of the cars was a gift or loan to him. Petitioner was not obligated to perform any special services for the Ford Motor Co. in return for the privilege of using the cars, and there was no employment contract involved. In this situation, it is contended that the free use of the Thunderbirds did not constitute taxable income. Petitioner paid for all the operating expenses of the cars and the insurance.

We agree with petitioner's position that a taxable benefit does not arise every time an item of personal property is loaned to another. It should be noted, however, that respondent is not attempting to levy

a tax on the value of a Thunderbird but only on the estimated rental value for the period of use. Thus, retention of title to the Thunderbirds by the Ford Motor Co. is irrelevant to the instant controversy.

Petitioner attempts to distinguish a loan from a gift so that each may constitute an alternative ground for avoiding taxation. It is clear that the cars were in effect loaned to petitioner. But this factor does not determine the taxability of the economic benefit arising from the free use of the cars.

The more serious attack directed against respondent's determination is based on the exclusion of gifts from gross income under section 102. Thus, if it could be found that the use of the Thunderbirds arose from a gift within the meaning of section 102, petitioner would escape taxation on the value of such use.

In deciding whether petitioner received a gift with respect to the use of the cars, we are governed by the principles enunciated in *Commissioner* v. *Duberstein*, 363 U.S. 278 (1960). According to *Duberstein*, the most critical consideration in making this determination is the transferor's "intention." The *Duberstein* case, at page 286, contains the following statement on this subject:

We take it that the proper criterion, established by decision here, is one that inquires what the basic reason for his [the transferor's] conduct was in fact—the dominant reason that explains his action in making the transfer. * * *

The Court in *Duberstein* then proceeded to analyze applicable case law with respect to what types of motives or intentions of a transferor are indicative of a gift transfer qualifying under section 102. This analysis has been concisely summarized in *DeJong* v. *Commissioner*, 309 F. 2d 373, 379 (C.A. 9, 1962), affirming 36 T.C. 896 (1961), as follows:

The value of a gift may be excluded from gross income only if the gift proceeds from a "detached and disinterested generosity" or "out of affection, admiration, charity or like impulses" and must be included if the claimed gift proceeds primarily from "the constraining force of any moral or legal duty" or from "the incentive of anticipated benefit of an economic nature." * * *

The determination of the gift issue when approached with the *Duberstein* rationale is essentially dependent upon "the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case." *Commissioner* v. *Duberstein, supra* at 289.

The burden of proof to establish that the respondent's determination was wrong rests on petitioner. Due to the lack of evidence pertaining to the circumstances surrounding the loan of the Thunderbirds, we can only speculate about the reasons of the Ford Motor Co. for authorizing the loan. While it is possible that Ford was motivated by detached and disinterested generosity, it seems more likely that officials

of the Ford Motor Co. believed that the use of Thunderbirds by well-known and readily recognizable football stars of national renown would constitute valuable implied personal endorsements favorable to the sales image of Thunderbirds. This speculation is further supported by the fact that the Ford Motor Co. also furnished Thunderbirds to certain other members of the Packer team. Therefore, in the complete absence of any evidence to the contrary, it is logical to conclude that the Ford Motor Co. was motivated by commercial considerations in furnishing Thunderbirds to petitioner free of charge.

We feel that this factual determination is "based in the sort of informed experience with human affairs that fact-finding tribunals should bring to this task." *Commissioner* v. *Duberstein, supra* at 292. The burden on the taxpayer to introduce facts to establish the existence of a gift has not been met.

The petitioner has been unsuccessful in his attempt to persuade us that the free use of the Thunderbirds was a gift or is specifically excluded from taxation by any applicable section of the Code. We must still decide, however, whether an economic benefit of the type here received is includable in gross income under the particular circumstances of this case.

Respondent argues that petitioner received an economic benefit solely because of his status as a football celebrity, and that the measure of the economic benefit is the rental value of petitioner's use of the cars. This is the amount of money that the average man on the street would have to expend to obtain the same use. Thus, for all practical purposes, petitioner was enriched in an amount equal to what the normal person pays for renting Thunderbirds.

Section 61(a) provides that gross income includes "all income from whatever source derived." The Supreme Court in *Commissioner* v. *Glenshaw Glass Co.*, 348 U.S. 426 (1955), and *General Investors Co.* v. *Commissioner*, 348 U.S. 434 (1955), construed the phrase "gains or profits and income derived from any source whatever," which constituted part of the definition of gross income in section 22(a) of the Internal Revenue Code of 1939, as encompassing punitive damages for fraud and antitrust violations involved in *Glenshaw Glass* and insider profits involved in *General Investors*.

Certain language in the preceding two cases supports the proposition that gross income is an all-inclusive concept. In *Glenshaw Glass*, at pages 431–433, the Court stated:

Here we have instances of undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion. * * *

* * * We would do violence to the plain meaning of the statute and restrict a clear legislative attempt to bring the taxing power to bear upon all receipts constitutionally taxable were we to say that the payments in question here are not gross income. * * *

The Court utilized similar language in *General Investors*, at page 436:

As in *Glenshaw*, the taxpayer realized the money in question free of any restrictions as to use. The payments in controversy were neither capital contributions nor gifts. * * * In accordance with the legislative design to reach all gain constitutionally taxable unless specifically excluded, we conclude that the petitioner is liable for the tax * * *

The elimination of the words "gains or profits" from the definition of gross income in the 1954 Code has not affected the importance of *Glenshaw Glass* and *General Investors*. In referring to the significance of this deletion in view of the legislative history of section 61(a), the Court in *Glenshaw Glass*, at page 432, made the following comment:

Nor does the 1954 Code's [9] legislative history, with its reiteration of the proposition that statutory gross income is "all-inclusive," [10] give support to respondents' position. The definition of gross income has been simplified, but no effect upon its present broad scope was intended.[11] * * * [Footnotes omitted.]

We hold that the free use of the Thunderbirds constituted income to petitioner within the meaning of section 61. The rationale of *Glenshaw Glass* and *General Investors* seems equally applicable to the present situation. Petitioner received a valuable benefit which was fully realized by him in a business context.

This case is clearly distinguishable from the bargain purchase line of cases where the benefit is often not realized until the subsequent sale of the property at which time the bargain element may be ascertained with accuracy and accordingly taxed. See *Palmer* v. *Commissioner*, 302 U.S. 63 (1937); *Commissioner* v. *LoBue*, 351 U.S. 243 (1956). There is no possibility of postponing the incidence of taxation on the benefit received by petitioner in furtherance of sound tax administration goals; the benefit of using the cars was realized in 1962 and it must be taxable in the year of receipt or it will never be taxed. In receiving the free use of the Thunderbirds to use as he saw fit, petitioner received additions to gross income. See *William A. Brown*, 47 T.C. 399 (1967).

It seems clear that a person may receive a taxable benefit even though it is not "earned" in the sense that special duties in return for the benefit are required. Due to petitioner's unique status as a football celebrity, his endorsement of commercial products is obviously valuable to various business interests. His 1962 income tax return evidences that fact. In our view, the essence of the transaction was the endorsement element. The Ford Motor Co. received the intangible benefits of petitioner's implied personal endorsement of Thunderbirds by authorizing the free use of the cars. Petitioner benefited by this arrangement in an amount equal to the rental value of his use of the Thunderbirds. Thus, there was consideration for entering into the

arrangements on either side. In such a commercial context, we think that respondent's determination should be upheld, particularly since petitioner produced no evidence to indicate a contrary conclusion.

The fact that petitioner could only realize the benefit by doing what was valued by the Ford Motor Co., using the Thunderbirds, is certainly unusual. However, this factor should not determine the taxability of the benefit. The rent-free occupancy of a house has often been held to be income to the occupier despite the fact that the benefit could only be realized by actually living in the house. See *Chandler* v. *Commissioner*, 119 F. 2d 623 (C.A. 3, 1941); *Paulina duPont Dean*, 9 T.C. 256 (1947), and *Charles A. Frueauff*, 30 B.T.A. 449 (1934).

It is our considered opinion, therefore, for all of the foregoing reasons, that petitioner should have included the value of the use of the Thunderbirds in his gross income for the taxable year 1962. Respondent has determined that value as $600, and petitioner has not produced evidence to overcome the presumption of correctness of that determination.

### Issue 3. The Mink Stole

Respondent has determined that petitioner's gross income for 1962 should have included the fair market value of a fur stole received by petitioner's mother from the Green Bay Packers, Inc. If for no other reason, due to our factual finding that petitioner's mother actually received the stole before the end of 1961, and because petitioner utilized the cash receipts method of computing income, we must hold that the receipt of the fur stole did not constitute income to petitioner in 1962. Since petitioner's taxable year 1961 is not before us, we are precluded from further consideration of this issue.

*Decision will be entered under Rule 50.*