ATHENAISE M. HILL AND JOHN L. HILL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

HALLIE TENNER AND JACK TENNER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1780-70, 5001-71, 1795-70.    Filed November 19, 1974.

*Leo Branton, Jr.,* for the petitioners in docket Nos. 1780-70 and 5001-71.

*Harry Margolis,* for the petitioners in docket No. 1795-70.

*Sheldon M. Sisson* and *George W. McDonald,* for the respondent.

FORRESTER, *Judge:* In these consolidated cases, respondent has determined the following deficiencies in, and additions to, petitioners' Federal income taxes:

| Petitioners | Taxable year | Deficiency | Sec. 6653(a) [1] penalty |
|---|---|---|---|
| Athenaise M. and John L. Hill _____ | 1965 | $5,015.23 | $250.76 |
| | 1966 | 3,906.72 | 195.34 |
| | 1967 | 4,874.00 | 244.00 |
| | 1969 | 163.00 | --- |
| Hallie and Jack Tenner _____ | 1965 | 6,774.08 | 250.76 |
| | 1966 | 1,943.20 | 195.34 |

It was also determined that there had been an overassessment of $53 on Hill's 1968 return. Respondent has conceded certain issues, and the following remain for our decision:

(1) Whether petitioners, between 1965 and 1968, were the owners for tax purposes of the leases and buildings of a certain shopping center, thus entitling them to deduct an allocable share of the shopping center's losses;

(2) If we find that petitioners were the owners, for tax purposes, of the shopping center, whether they used a proper basis and useful life in claiming depreciation deductions;

(3) Whether respondent has properly assessed section 6653(a) penalties on petitioners.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Jack and Hallie Tenner are husband and wife who, at the time they filed the petition herein, resided in Los Angeles, Calif. They filed their joint Federal income tax returns for the 1965 and 1966 calendar years with the district director of internal revenue, Los Angeles, Calif.

John and Athenaise Hill are husband and wife who, at the time they filed their petitions herein, were residents of Los Angeles, Calif. They filed joint Federal income tax returns for the calendar years 1965, 1966, and 1967, with the district director of internal revenue, Los Angeles, Calif., and for the calendar year 1969, with the district director in Ogden, Utah.

In 1955, Simon Lazarus (Lazarus) and three associates purchased an 18-acre tract of unimproved property (hereinafter the Fox property) in Los Angeles County, Calif. Shortly thereafter, and also after the county had condemned 8 of such acres for the construction of a new high school, Lazarus entered into negotia-

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise specified.

tions with a California corporation, Fox Markets, for the building of a market on the tract. It was planned at that time that a Fox Markets' branch would form the nucleus of a shopping center which would contain numerous other smaller businesses. Lazarus arranged for an interim construction loan with Union Bank, a permanent loan with Connecticut General Life Insurance Co. (Connecticut General), and certain additional financing. Construction of the shopping center began in 1958, and was completed the following year. Early in 1959, Fox Markets took occupancy as the principal lessee, and all other stores in the center were leased at the same time. By 1959, Lazarus was sole owner of the center, having bought out the three associates with whom he had originally entered the venture.

On April 15, 1963, Lazarus incorporated N & V Realty Corp. (N & V) under the laws of California. Later that year, Lazarus transferred the Fox property to N & V in exchange for all issued shares of the company. The transfer was made subject to Lazarus' outstanding obligations of approximately $413,000 to Connecticut General, and approximately $169,000 to another company not named in the record. Lazarus agreed to remain personally liable on the outstanding indebtedness, but would have the privilege of replacing the current loans with another loan not to exceed $650,000 which could be secured by the Fox property.

On December 18, 1963, Lazarus incorporated Lazarus Realty Co. (Realty), and such corporation immediately entered into a contract to manage N & V. N & V agreed to pay Realty $2,000 a month as a management fee plus 15 percent of all gross revenues earned by N & V in excess of $12,500 a month, or in excess of $150,000 a year, whichever method produced the higher amount. In addition to typical management functions, Realty also agreed to guarantee the payment of all rent under the shopping center leases, and would enter or change leases only with the prior approval of N & V.

On June 18, 1963, Lazarus, acting under the advice of Harry Margolis (Margolis), a California attorney, transferred all the stock of N & V to an irrevocable trust he had formed earlier that year for his children. In return for the shares of stock, Lazarus and his wife Mina were to receive an annuity of $75,000 per year from the trust until the survivor of him and Mina died. This amount was determined by dividing what Lazarus considered to be the fair market value of the stock, $1,575,000, by 21, which

was the joint and several life expectancy of him and Mina. Lazarus did not retain a security interest in the shares of stock under the annuity agreement, and the trustee was given full powers to sell the stock to third parties. The trustee was a Bahamian trust company, Aruba Bonaire Curacao Trust Co., Ltd. (ABC), a company which represented more than 60 members of the New York Stock Exchange, and over 800 corporations in all.

The payments under the annuity were to be made—out of rents collected from shopping center tenants—before June 30 of each year, commencing in 1964. The following payments were actually made:

| | | |
|---|---|---|
| 4/16/64 ____$20,000 | 10/21/65 ___$75,000 | 11/25/68 ___$42,500 |
| 6/22/64 ____ 55,000 | 3/12/66 ____ 75,000 | 10/27/69 ___ 42,500 |
| 8/9/65 _____ 75,000 | 11/25/68 ___125,000 | 9/2/70 _____ 42,500 |

In 1968, the annuity agreement was amended to provide that from and after January 1, 1968, the annuity would be severed to provide two separate annuities, one for Lazarus, and the other for Mina, with Lazarus to receive $62,500 per annum under the new arrangement.[2]

On January 2, 1964, ABC, as trustee of the Lazarus trust, sold all the N & V stock to World Entertainers Ltd. (WE), a Bahamian corporation. The terms of the sale provided that WE would give ABC a nonnegotiable promissory note in the face amount of $1 million, such sum payable in cash on January 1, 1984. Interest in the amount of $75,000 per annum—thus equal to the amount provided for under the original Lazarus annuity— was to be paid ABC each year by WE until the note was paid off. ABC was given the option of accelerating payment for the stock before December 31, 1981. In case of such acceleration, however, the amount to be paid ABC would be determined by an appraisal of the N & V property 1 year after the date of acceleration. One year after such appraisal, WE would have to commence yearly payments of $100,000 of principal until an amount equal to the value of the property as determined by the appraisal was paid to ABC. The record is barren of any description of WE's assets or business.

---

[2] Mina would receive $42,500 a year, such amount determined by dividing by two $1,275,000, the amount deemed still payable under the old annuity on the basis of life expectancies, and then dividing the resulting figure by 15, which was Mina's own life expectancy in 1968. Lazarus' life expectancy at this time was calculated as 10.2 years— hence the higher annual payment.

Shortly after the ABC-WE transaction, WE sold the N & V stock to Associated Arts, N.V. (AA), a Netherlands Antilles corporation, on terms not disclosed in the record. AA was a highly diversified corporation. It had been active in both successful and unsuccessful motion pictures, television features and series, Broadway plays and musicals, and had been involved in contracts with recording artists. It owned stock in a Federal housing authority lending corporation, and in various American corporations of substantial character engaged in the leasing of machinery and equipment, the licensing of patents and processes, the publication of books and magazines, and heavy construction.

In April of 1964, the N & V stock was again sold, this time by AA to Branjon, Inc. (Branjon), a California corporation. Branjon had been incorporated the previous year by Leo Branton (Branton), a lawyer with a substantial practice representing famous members of the entertainment industry. Branton, who at all times relevant to the instant case was Branjon's sole shareholder, had two major business goals in mind when he incorporated Branjon: first, he wanted to engage in ventures in the entertainment industry when such opportunities arose; and second, he was interested in procuring and managing investments of various types for his clients in the entertainment field. It was Branton's intention that Branjon would be the vehicle through which he would accomplish such goals.

Branton had been looking for tax-sheltered investments in early 1964 when he learned that AA was interested in disposing of its interest in the Fox property. Branton was already quite familiar with such property, having represented a company which had been interested in acquiring the Fox Markets' lease during certain bankruptcy proceedings in 1961. Branton was also familiar with the two managers of AA, but had no control or ownership interest in AA. An agreement of sale was signed by the parties on April 6, 1964, the terms of which were significantly influenced by the tax situations of the two entities. AA, a Netherlands Antilles corporation, was very desirous of limiting the amount of interest income the transaction would be deemed to generate, for, under the U.S. tax treaty with the Netherlands, AA would have been taxed at a 2.4-percent rate on the first $13,000 of such interest income, and at a 3-percent rate thereafter. Because of the income tax laws in the Netherlands Antilles, however, AA would entirely escape any taxation on that

part of the selling price deemed to be capital gain. Branjon, at the same time, wished to obtain as high a basis for depreciation as possible, thus affording itself and any of its future clients a greater sheltering effect. With these considerations in mind, the parties, under the provisions of the contract (to be set out in more detail below) agreed to capitalize a certain—though unspecified— amount of the interest otherwise flowing from the transaction.

The actual written agreement entered into on April 6, 1964, provided that Branjon was to purchase all the N & V stock from AA for a total price of $3,750,000, with $3 million of such amount deemed to be principal. Payment was to be made over a period of 37 years at the rate of $100,000 per year, with the first 10 annual payments deemed to consist of $75,000 interest, and $25,000 principal, and with all payments thereafter to consist entirely of principal. The agreement further provided that:

> In addition to the foregoing payment, Branjon shall pay AA the net cash flow received by Branjon, after taxes if any, from the operation of N & V Realty Corporation or from the property now owned by N and V Realty Corporation to the extent that such net cash flow shall exceed the payments of $100,000.00 per year provided for immediately above.

Soon after the agreement of April 6, Branjon liquidated N & V and thus came into direct ownership of the Fox property and the related leasehold interests and buildings. On August 1, 1964, Branjon joined Lazarus in refinancing Lazarus' outstanding first deed of trust to Connecticut General. With the Fox property as security the two parties cosigned a note in the amount of $650,000 in favor of Connecticut General. The record is silent as to any value flowing to Branjon for signing this note. The note was for 20 years, with annual payments of $4,660.50, the balance being due on November 1, 1984. In 1965, Lazarus paid off his indebtedness on his second and third deeds of trust on the Fox property.

At the time Branjon acquired the N & V stock, Branton had thought that he might make a quick sale of such stock to the singer Nat "King" Cole, but Cole ultimately decided that he was not interested in making such investment. Branjon instead, on August 19, 1964, sold the buildings located in the center, consisting of one supermarket and 11 other stores, with their accompanying leases (collectively to be referred to as the improvements) to a group (the undivided interests) made up of seven individuals, including the two petitioners in this case, and

one corporation. The seven individual owners were basically high-bracket taxpayers working in the entertainment or professional fields. Most of the seven, including the petitioners in the instant case, were old friends or clients of Branton. Others became acquainted with the Fox property through Robert Kahan (Kahan), a C.P.A. for over 25 years and old acquaintance of Branton, whom Branton had asked to do the accounting work for the Fox property after the April 1964 purchase. It would be Kahan who would prepare all Federal income tax returns for the petitioners for the years involved in the instant case. Three of the owners were clients of Margolis, who had advised Branton on the acquisition of the N & V stock, and who had done the basic tax planning for the purchase of the improvements by the undivided interests. Branton, Margolis, and Kahan pointed out to the undivided interests the significant tax shelter and hedge against inflation which the improvements would constitute. The shelter would result mainly from accelerated depreciation and the capitalization of interest provided for in the sale from AA to Branjon, the inflation hedge from the fact that the Fox leases were percentage leases, i.e., tied to the gross receipts and profits of the individual stores. The undivided interests would be basically passive investors and had, and would continue to rely almost totally on, the advice of the three men in making any decisions in relation to the improvements.

The actual agreement of sale of August 19, 1964, required the undivided interests—who would hold the improvements as tenants in common with undivided interests—to deposit a total of $75,000 with Branjon as security for their performance under the contract. This sum of money, which came from the personal resources of each of the investors, including petitioners, would be applied in 1969 against the outstanding principal then due, assuming the proper performance, in the interim 5-year period, of all obligations under the agreement of sale. Each $5,000 share of the deposit entitled an individual undivided interest to a one-fifteenth ownership interest in the improvements. Hill and Tenner each contributed $10,000 to the total deposit, and thus were each owners of two-fifteenth's undivided interest in the improvements.

The sale price of the improvements not including interest was set at $2,368,699.50, which represented the parties' estimation of Branjon's September 1, 1964, undepreciated basis in such

improvements. The terms of sale, including the payment provisions, mirrored those of the April 6 agreement between Branjon and AA, except that the actual amount of each individual payment was reduced by the pro rata part of each of the payments to AA which was deemed allocable to the underlying land upon which the center was located. The undivided interests acknowledged the existence of certain encumbrances of record on the property, and it was expressly provided that the property could be utilized for other loans, so long as the total amount of such secured indebtedness did not exceed $700,000. Branjon guaranteed to the undivided interests that it would perform on its secured obligations, and it was agreed that no further encumbrances would be placed upon the property after 1964. *Thus Branjon was obligated to apply the payments it received from the undivided interests in satisfaction of its obligations to AA.* Nevertheless, AA refused to accept the substituted liability of the undivided interests, and Branjon thus remained directly liable on its contract with AA.

As far as the actual land component of the Fox property, on August 17, 1964, 2 days before the undivided interests purchased the improvements, a partnership (the partnership) was formed, five of the seven members of which were trusts for the minor children of individual members of the undivided interests, including two separate trusts for the children of the two petitioners in the instant case. The partnership was to be managed by Joel Kahan, an attorney in Margolis' office, and Robert Kahan (Kahan) was designated as an arbiter in case of any disputes.

On August 19, 1964, the partnership purchased the Fox land from Branjon for $549,575, in deferred payments, but again such amount not to include any interest. Such amount represented the parties' estimation of that part of Branjon's September 1, 1964, basis under the agreement with AA, which was allocable to the land component of the Fox property. With exceptions to be discussed below, the payments would mirror, on a pro rata basis, Branjon's obligations to AA. Thus, taking together the two purchase contracts of August 19, 1964, the combined payments required were identical, both in terms of amount, as well as in terms of what share was deemed principal and what share interest, to those required of Branjon under its April 6 agreement with AA.

The partnership articles of August 17 had provided that a downpayment of $75,000 would be made on the purchase price of the land—with the trusts for the minor children contributing their entire capital to fulfill such downpayment. The actual sales agreement with Branjon, however, made no mention of any such downpayment.

On the same day as the twin purchases from Branjon, the partnership and undivided interests entered into a written agreement under which the Fox land was leased to the undivided interests until July 27, 1981, at an annual rental of $50,000. The undivided interests were given an option to purchase the land from the partnership after August 19, 1974. The lease agreement further provided that the partnership would make the first $549,575 of principal payments due AA from Branjon, under the April 6 contract, with the undivided interests to pay off the balance of the principal and all the interest due. The partnership agreed to lend the undivided interests, each year, the amount by which $50,000, which was the rental payment due it from the undivided interests, exceeded the amount of principal which would have to be paid that year—which was $25,000 over the first 10 years as provided in the April 6 agreement. The undivided interests agreed to pay all taxes, on the Fox property, whether allocable to the land or improvements, as well as a $2,000 per month management fee to be described below.

The property was to be managed for a fee of $2,000 a month by Branjon, which would also retain solely for the convenience of all parties record ownership of the land. Such management rights could not be terminated by either the partnership or the undivided interests until Branjon's liability to AA was extinguished. The management agreement gave Branjon responsibility for handling receipts and expenses of the Fox properties, with any cash left over in the accounts of either the partnership or the undivided interests, after payments of expenses, including the installment obligations of purchase, to be applied to further reduce the principal sum due Branjon. Because of its prior contract with Realty, however, Branjon had to rely on Realty for management of the property, a situation which would result in numerous disputes to be described below.

By the end of 1964, Margolis and the other financial and tax advisers to the transaction came to realize that they had omitted an important consideration in drawing up the April and August

1964 agreements. In their negotiations, the parties had apparently discounted the relevance to the transactions of section 483, which had been passed in February of 1964. By early 1965, the parties were convinced that the Service would utilize the provisions of that section to require that both Branjon and AA report a larger share of the total purchase prices as section 483 imputed interest.

To deal with this potential dilemma, AA, Branjon, the undivided interests, and the partnership agreed on February 5, 1965, to a substantial modification of the April and August agreements. Branjon, the undivided interests, and the partnership were all represented by Margolis during the negotiations leading to the revised agreements. Margolis, acting under powers of attorney, signed the agreements for the undivided interests, while Branton signed for Branjon, and Joel Kahan for the partnership.

The agreement between Branjon and AA was modified in pertinent part as follows:

5. The interest to be paid by Branjon to AA under the agreement of April 6, 1964, is hereby modified as follows:

a. $50,000.00 in interest shall be paid by Branjon to AA on or before January 31, 1965, and AA acknowledges receipt of such sum.

b. $75,000.00 in interest shall be paid by Branjon to AA for the period from February 1, 1965, to and including January 31, 1966.

c. $75,000.00 in interest shall be paid by Branjon to AA in each of the three subsequent fiscal years beginning February 1, 1966.

d. In each of the five subsequent fiscal years beginning February 1, 1969, Branjon shall pay to AA as interest the sum of $125,000.00.

e. Within 30 days of the end of the fiscal year ending January 31, 1974, the parties shall jointly make a calculation of the minimum total amount of interest required under the agreement between them in order to comply with the provisions of Section 483 of the Internal Revenue Code of the United States of America, based upon the outstanding balance of principal due from time to time during the period from April 6, 1964, to and including the date on which the calculation shall be effective, which in the absence of independent agreement shall be the last date of the 10th 12-month period. Any interest then due shall be paid immediately. In event there has been an overpayment of interest, then such interest shall be credited to the interest due in the ensuing 12-month period.

f. From and after the 10th 12-month period, Branjon shall annually pay to AA as interest such sum as shall represent the minimum interest then due under the provisions of Section 483 of the Internal Revenue Code of the United States.

* * *

7. Prior to January 31, 1975, Branjon shall pay to AA as principal, in addition to the interest payments provided for hereinabove, the sum of $125,000.00, and annually prior to January 31st of each year thereafter Branjon shall pay to AA as principal, in addition to the interest as hereinabove provided, the sum of $125,000.00. Branjon shall be free to make additional payments of principal at any time. The balance of the total sum of $3,000,000.00 in principal shall be paid in full on April 6, 1985.

8. Any cash flow from the market complex over and above that necessary for the payment of obligations due AA under this contract may be retained by Branjon as its own. This applies only to the AA-Branjon relationship.

&ast; &ast; &ast;

11. AA hereby makes guarantees to Branjon as follows:

a. That for the period of April 6, 1964, to and including January 31, 1974, the gross income from the Shopping Center Operation will be not less than $1,600,000.00.

b. In event that the calculation of gross rentals received during such period shall be less than $1,600,000.00 then AA shall in the month of February, 1974, pay to Branjon the difference between the rentals received and the sum of $1,600,000.00, provided only that Branjon shall be current in all respects under its payments due to AA.

c. That for the period commencing February 1, 1974, and ending April 6, 1985, AA guarantees to Branjon that the gross income shall not be less than $2,900,000.00.

d. In event that the calculation of gross rentals received during such period from February 1, 1974, and ending April 6, 1985, shall be less than the sum of $2,900,000.00, then AA in the month of April, 1985, shall pay to Branjon the difference between the sum of $2,900,000.00 and the gross amount of rentals received, provided only that Branjon shall in all respects be current on its then outstanding payments due to AA, and further provided that AA shall be entitled, in making up such guarantee, to the benefit of any overage from the prior period ending January 31, 1974.

The agreement between Branjon and the undivided interests was modified to provide terms of payment identical in all material respects (except for purchase price) to those set forth above in the revised Branjon-AA agreement. In the revised Branjon-AA agreement, $3 million was deemed to be the amount of principal due, while in the undivided interests-Branjon agreement, $2,306,365 was deemed principal, the lower amount reflecting the absence of the land component of the property. The agreement also contained the following provisions:

18. *Branjon hereby makes guarantees to Owners as follows:*

   a. For the period of August 19, 1964, to and including December 31, 1973, *the total net income from the market rentals shall be not less than $900,000.00.* Net income is defined as that income remaining after costs and expenses of management, rent, taxes, repairs, maintenance, and insurance, but excluding interest payments to Branjon due from Partnership and Owners.

   b. *In the month of January, 1974, Branjon shall pay to Owners the difference between $900,000.00 and the actual net sum collected in rentals, if any, provided that Owners are in all respects current with Branjon on payments due under this agreement.*

   c. For the period beginning January 1, 1974, and ending December 31, 1983, the net income, as said term is defined above, excluding rent only from and after August 19, 1974, shall be *$2,100,000.00.* No guarantee shall extend beyond January 1, 1984.

   19. *Branjon and Owners agree that Branjon shall retain title to the land by reason of the requirement as between Branjon and AA that Branjon retain title so long as there is liability from Branjon to AA under this agreement and the agreement of April 6, 1964.*

The lease agreement between the undivided interests and the partnership was modified as follows:

   a. The lease shall expire on August 19, 1974, and lessee shall on that date purchase the land, which is the subject of the lease, for $450,000.00. Lessee may at its option pay such sum in cash on or before December 31, 1974, without interest, or lessee may pay said sum in nine (9) equal annual installments of $50,000.00 each plus interest at the rate of four per cent (4%), with the first such payment due in January, 1975. Lessee may at any time make full payment at its option.

   b. The rental shall be $50,000.00 per year for 1965 through August 18, 1969, inclusive. The rental from August 19, 1969 to and including the date of purchase, August 19, 1974, shall be $25,000.00 per year.

   c. All rental payments shall be made by lessee directly to Branjon, to be applied by Branjon on the purchase price of $549,575.00 with each such rental payment being available for application one hundred per cent to principal. Lessee shall pay all interest due to Branjon resulting from the addition of four per cent (4%) interest to said purchase price.

The undivided interests also agreed to pay the annual interest of 4 percent, which the partnership owed Branjon under the agreement for the sale of the land. The undivided interests would also pay all real property taxes on both the improvements and the land.

The partnership's agreement with Branjon was modified to provide a 4-percent interest rate on the outstanding principal amount of $549,575, with the partnership required to pay a total of $50,000 of interest and principal per annum through August 18, 1974, at which time the full amount would become due.

Branjon, as was provided in the August 1964 agreements, would continue to manage the shopping center complex with the undivided interests paying Branjon $2,000 per month for such services. The owners could terminate this contract at any time on 90-days' notice, but upon termination, Branjon's guarantee of income to the undivided interests would also lapse. It would be Branjon's duty to collect all rents and pay the expenses of the center, with any excess being applied to the following items in the order indicated:

a. The first funds shall be paid in satisfaction of the interest obligation pursuant to this agreement including all interest due from Partnership to Branjon which Owners have assumed.

b. The next $50,000.00 shall be credited to Partnership principal due Branjon for the years 1965-1968 inclusive and pro-rata until August 18, 1969, with $25,000.00 to be so credited each twelve months thereafter.

c. Any remaining sums shall be credited by Branjon to the principal payments due from Owners to Branjon. * * *

Thus, until payment of the entire purchase price to Branjon, which, in any event, would occur no later than January 31, 1985, the undivided interests could expect no positive cash flow from the Fox property.

While all the above-mentioned agreements were set forth in a single document, the agreement states that:

3. The agreement between AA and Branjon on the one hand, and the agreements between the other parties on the other hand are separate agreements. AA is in no manner involved in the agreements between Branjon, Partnership and Owners, but the various agreements between the parties are incorporated in this one document because of the interrelationships of the parties and for sake of clarity of understanding.

Branton and Margolis were convinced that the February negotiations had produced a highly advantageous arrangement for the undivided interests. Taking into account the guarantees from Branjon, as well as projected income from the property, it was estimated that the undivided interests would have to contribute from personal funds approximately $460,000 during the first 10 years of the payment period, and approximately $900,000 during the last 10. It was also estimated that the interests would have operating losses for tax purposes from the Fox property of approximately $2 million over the 20-year period. For 50-percent bracket taxpayers, this represents a tax savings of approximately $1 million, and thus the total net cost of

the Fox property to the undivided interests would be approximately $360,000. Respondent does not dispute the reasonableness of such estimates.

From 1965 through January 1968, the undivided interests paid all expenses incurred in the operations of the Fox property. As can be observed from the chart on page 241 below, expenses, excluding depreciation, exceeded income from the property by approximately $60,000 over that 3-year period. Thus, taking into account the $75,000 security deposit given in 1964, the undivided interests had to provide, out-of-pocket, approximately $135,000 during the 1965 to 1967 period.[3] Each of the undivided interests, except for petitioner Hill, borrowed, during the 1967 to 1972 period, from the Anglo Dutch Capital Co. (Anglo Dutch), a California corporation belonging 50 percent to Margolis and 50 percent to Walter Joe, a C.P.A. Except in the cases of Mitchell Levy and Norman Pitt, two members of the undivided interests, however, repayments of such debts were substantial over the period described—repayments being made from personal resources, loans from banks, as well as by renewals.

Until late 1967, Branjon continued to be responsible to the undivided interests for the management of the Fox property through its contract with Realty. All funds from the operation of the Fox property were deposited in what was called the market account, from which were paid the operating expenses and then the principal and interest obligations of the parties to Branjon. Lazarus, as president of Realty, had full authority through 1967 to write checks on the account for operating expenses, and always paid over all net income from such account to Branjon as interest and principal\ payments for the undivided interests and the partnership.

While Lazarus, as president of Realty, managed the Fox property through 1967, it is clear that the undivided interests looked to Branton, Margolis, and Kahan to promote their interests in the property. Branton was not particularly happy with the Realty contract, feeling that the fees were unreasonable for the services rendered, and having disagreed with a number of the decisions Lazarus reached in managing the property. After numerous disputes, on December 21, 1967, Branton effected a

---

[3] While the January 1968 account showed a positive cash flow to the undivided interests of approximately $17,000, such funds were undoubtedly retained by Branjon to be applied against the principal obligation due, as provided by the February 1965 agreements.

termination of the contract with Realty. Realty agreed to pay back to the undivided interests $40,000 in fees, and Lazarus individually undertook to offer free management services to the undivided interests and the partnership for an additional 2 years. He apparently did provide such further services on a no-charge basis, but was expressly required under the December termination agreement to seek the written approval of Branjon for any action he might take with respect to the property. In the termination agreement, the parties, without any explanation, referred to the properties which Realty had managed as belonging to Branjon.

On December 28, 1967, Branjon and Lazarus entered into a separate agreement in which Branjon agreed to assume liability for Lazarus' $672,999.98 first deed of trust to Connecticut General which was secured by the Fox property. In return, Lazarus executed a negotiable promissory note to Branjon for $672,000 at 6-percent interest, payable on January 1, 1977. Lazarus further guaranteed to Branjon that rentals from the Fox property would equal at least $140,000 in 1968, and would increase by at least $2,000 per year for the following 10 years. As security for the obligation Lazarus pledged a $705,000 note he had received from Las Posas Development Co. in a land sale—a note upon which Lazarus could make full demand at any time prior to June 15, 1968. Although Branjon assumed the liabilities of Lazarus—as between it and Lazarus—the parties feared that such assumption if brought to the attention of Connecticut General might trigger a demand for full payment of the Lazarus indebtedness. Thus, it was agreed that Lazarus would continue to make the actual payments on the outstanding first deed of trust to Connecticut General, but would be reimbursed for such payments by Branjon. Lazarus has made all required payments on the indebtedness, and the outstanding amount of such indebtedness in 1972 was $500,000.

The reliance of a number of the undivided interests on mainly Branton in handling and managing their investment in the Fox improvements was reciprocated by Branton's own strong personal feelings of responsibility for having advised their participation. In 1968, as he had been planning for a number of years, Branton retired from the practice of law and moved to Mexico, where he lived for a year. At the time he left for Mexico, Branton had no intentions of returning to the U.S. for any extended period of

time, and with this in mind, disposed of a number of his assets in this country and numerous other of his responsibilities. Feeling that he would no longer be able to give the kind of personal attention to the affairs of Fox which he felt it was his professional responsibility to provide for his clients, and worried by numerous audits the Internal Revenue Service was making in relation to the property, Branton advised those clients whom he had specifically asked to invest in Fox, including Hill and Tenner, to resell the property to Branjon. To effect such sale, he asked Margolis and Kahan, as representatives of all the undivided interests, to arrive at a fair price for which the interests could resell the improvements to Branjon. Such resale occurred on January 31, 1968, but the record is barren of any description of the terms of such transaction.

It is to be noted that at the time of the resale to Branjon, Hill and Tenner owned only respective one-fifteenth interests in the Fox property. This is because in early 1965, in preparation for a purchase by the undivided interests of an apartment complex, the undivided interests had been increased in number such that petitioners' initial $10,000 investments only represented a one-fifteenth interest in the combined properties. The apartment complex was plagued by numerous economic and legal difficulties during the 1965 to 1968 period, and was sold by the undivided interests to Branjon at the same time as the Fox improvements, on January 31, 1968. Branjon quickly resold the apartment complex to Kahan, Margolis, and Branton, and these three individuals, with Kahan acting as manager, still owned it at the time of the trial in the instant case.

In 1972, Lazarus, claiming that he was entitled at that time to rescind the sale of Fox he had made some 9 years previously, entered into a lease agreement, which designated him as the owner, with Ralph's Market the major tenant of the shopping center.[4] His claim of the right to act as owner of the center was short lived, however, and, upon being challenged by Margolis, he agreed that his functions were strictly managerial. The lease which he had signed was then voided and a new lease agreement drawn up and signed. Ralph's, however, was somewhat shaken when it learned that Lazarus' claim of ownership was erroneous.

---

[4] Lazarus had been given tenant procurement responsibilities by the GMSZ partnership, then the owner of the Fox improvements. Two of the members of GMSZ, which was managed by Margolis, had been members of the undivided interests.

As requested by Ralph's, the new lease was signed by all three of the entities, including Branjon and the GMSZ partnership, which had had ownership interests in the Fox property subsequent to the sale in 1968 by the undivided interests.

The GMSZ partnership had purchased the Fox property on December 31, 1971, giving a note to the seller for $2 million, payable on or before January 5, 1973, with interest at 10 percent. In 1972, the property yielded rental income of $148,288. Net income was $62,530, but it is to be noted that expenses for 1972 were not deemed to include any interest on the note. A full $200,000 interest deduction was instead taken on GMSZ's 1971 Federal income tax return.

On his 1965, 1966, and 1967 income tax returns, petitioner Hill claimed the following losses from the operations of Fox:

| | |
|---|---|
| 1965 | $11,334 |
| 1966 | 13,436 |
| 1967 | 13,643 |

| | 1965 | 1966 | 1967 | January 1968 |
|---|---|---|---|---|
| Gross income | $127,200 | $131,295 | $141,955 | $34,875 |
| Expenses: | | | | |
| Advertising | --- | 120 | 295 | --- |
| Commissions | 4,275 | 4,935 | 4,692 | 390 |
| Depreciation | 165,900 | 167,715 | 154,928 | 11,880 |
| Insurance | 1,725 | 1,455 | 1,489 | 360 |
| Interest | 52,005 | 75,000 | 75,000 | 6,250 |
| Repairs | 840 | 1,110 | 2,817 | 1,275 |
| Salaries | 20,760 | 24,000 | 24,000 | 950 |
| Utilities | 225 | 190 | 192 | --- |
| Property taxes | 5,925 | 6,045 | 3,025 | 3,105 |
| Ground rent | 45,555 | 49,995 | 50,000 | 4,170 |
| Miscellaneous | --- | 2,265 | 160 | 1,230 |
| Total expenses | 297,210 | 332,835 | 316,598 | 29,610 |
| Net income (loss) | (170,010) | (201,540) | (174,643) | 5,265 |
| $\frac{1}{15}$ undivided interest | (11,334) | (13,436) | (11,643) | 351 |

Petitioner Tenner took the same deductions on his 1965 and 1966 income tax returns as Hill took on his respective 1965 and 1966 returns.

The basis for depreciation used was $2,368,699.50, which was what the undivided interests had agreed to pay Branjon on August 19, 1964, having determined that that was Branjon's

basis in the leases and improvements as of September 1, 1964. A useful life of 19 years was selected on the basis that in 1965 the major lease had 19 years to run.

In his notices of deficiencies to both petitioners, respondent disallowed the loss deductions in full for the years claimed, but indicated that an overassessment had been made, due to inclusion of rental income, in Hill's 1968 return.

In his statutory notice to petitioner Hill, respondent also determined a section 6653(a) penalty for the taxable year 1967. In amended answers to the petitions in the instant case, further section 6653(a) penalties were determined by respondent for Hill's 1965 and 1966 calendar years, and for petitioner Tenner's 1965 and 1966 calendar years.

OPINION

In 1963, Simon Lazarus transferred to a trust for his children all the stock in a corporation, N & V, the only asset of which was a shopping center (Fox property). In return, he and his wife were to receive yearly payments of $75,000 from such trust. The trust eventually sold the stock to WE, which then sold the stock to AA. AA proceeded to sell the stock to Branjon. Branjon, a California corporation, liquidated N & V and entered into two contracts: one with a group of investors, called the undivided interests, for sale of the leases and shopping center buildings (the improvements), the other with a partnership made up of trusts for some of the minor children of the undivided interests, for sale of the shopping center land. The undivided interests were given an option to purchase this land from the partnership in 1974. On January 31, 1968, the undivided interests sold back the improvements to Branjon.

The first issue for our decision is whether the undivided interests, who include the two petitioners in the instant case, may be considered to be the owners of the improvements from 1965 through January 31, 1968. Resolution of such issue depends upon whether the agreement of August 19, 1964, as amended by the agreement of February 5, 1965, should be recognized, for tax purposes, as having effected a sale of such assets to the undivided interests. While it is respondent's position that the agreements of August 1964, and February 1965, constituted mere paper transactions, without substance, it is our finding that those contracts did effect a sale of the improvements to the undivided

interests. Hence, we hold that the undivided interests were the owners of the Fox improvements and that the petitioners in the instant case are entitled to deduct their allocable share of the shopping center's operating losses, together with interest.

In *Commissioner v. Brown,* 380 U.S. 563 (1965), the Supreme Court of the United States emphasized that the concept of "sale" should be substantially accorded for tax purposes its "common and ordinary meaning" in the "non-tax world." (380 U.S. at 570-571.) The Court cited a number of definitions of the term "sale" which it had utilized in prior decisions (380 U.S. at 571):

"A sale, in the ordinary sense of the word, is a transfer of property for a fixed price in money or its equivalent," * * * it is a contract "to pass rights of property for money,—which the buyer pays or promises to pay to the seller * * *

In a recent decision of this Court, *Aaron Kraut,* 62 T.C. 420 (1974), we expressed our own understanding of what concept of "sale" the Supreme Court was propounding in *Brown:*

Inherent in the Court's understanding of a sale is the notion of movement through exchange, the idea that, at the conclusion of the sale, the buyer possesses that which was the object of the sale. * * * [62 T.C. at 428.]

We think the August 1964, and February 1965, agreements clearly effected a "sale" as that term has been defined in the case law described above. Those agreements as written, as respondent concedes, had the effect of providing to the undivided interests, within 20 years, a shopping center valued at approximately $1.575 million in 1963, for a net cost of only $360,000. The purchasers were high-bracket taxpayers, who, it is not disputed, would be fully capable of paying off such net cost. And while there would be no positive cash flow from the property until about 1984, the interests could foresee over such period, the gradual buildup in their equity in a valuable piece of property—thus affording them an outstanding capital gain potential.

Unlike the situation in *Kraut,* where the sellers had an option to repossess the major income-producing asset involved in the sale, the seller here, Branjon, had no such contractual right. Before the undivided interests could be deprived of ownership of the property, they would have to consent to a further sale of the improvements, a clear indicia of ownership. And respondent does not even argue, as he did successfully in *Louis Berenson,* 59 T.C. 412, 423 (1972), on appeal (C.A. 2, May 1, 1973), that due to an excessive price, a sale should not be deemed to have occurred.

Respondent does not argue the point and the facts in the record would not support such a contention.

It is true that the property was encumbered by almost $700,000 of Lazarus' indebtedness during the period in which the undivided interests owned the improvements. Had Lazarus defaulted on his repayment obligations, the undivided interests might very well have been deprived of the property. However, the parties do not dispute that Lazarus was entirely responsible financially, and respondent makes no claim that there was ever any real danger of Lazarus not faithfully fulfilling his obligations.[5] Indeed, he completely paid off the second and third deeds of trust encumbering the property, and has made all required payments on the first deed of trust to Connecticut General. Under such circumstances, we simply do not see the Lazarus encumbrances as representing a substantial enough threat to the continued ownership of the property by the undivided interests to cause us to refuse to recognize the occurrence of a "sale" by virtue of the August 1964, and February 1965, agreements.

Petitioners frankly admit that tax considerations substantially influenced their entry into the agreements of August 1964 and February 1965. It goes without saying however, that the mere fact that tax planning is involved in structuring a transaction will not in itself cause us to ignore the transaction for tax purposes. Here, as we have described above, there was "some reasonable hope of the transaction appreciably affecting the taxpayer's beneficial interest other than by a tax reduction" *(Bridges v. Commissioner,* 325 F. 2d 180, 184 (C.A. 4, 1963), affirming 39 T.C. 1064 (1963)), namely the acquisition of certain valuable assets. Furthermore, over the 3-year period during which they owned the improvements the undivided interests paid all the expenses incurred in the operations of the shopping center, including their interest obligations to Branjon. From the schedule on page 241 *supra,* it can be seen that the undivided interests, from their own resources, had to contribute almost $60,000 over the 3-year period for operating expenses and interest payments in excess of the rental receipts.[6]

---

[5] In his brief, respondent refers to Lazarus as a "millionaire businessman."

[6] Respondent makes much of the fact that, except for Hill, all the undivided interests borrowed various sums of money from Anglo Dutch, a corporation owned 50 percent by Margolis. Respondent suggests that such payments, some of which may have been applied

It is true that the guarantees by Branjon in the February 1965 agreement would have at least partially reimbursed the interests in 1974 for such out-of-pocket expenses, and that the tax losses to be incurred would be further offsets—but the idea that a sale must be financed totally out of the personal resources of the buyer was effectively repudiated in *Commissioner v. Brown,* 380 U.S. at 575:

To require a sale for tax purposes to be to a financially responsible buyer who undertakes to pay the purchase price from sources other than the earnings of the assets sold or to make a substantial down payment [and here there was a downpayment of $10,000 from each of the petitioners] seems to us at odds with commercial practice and common understanding of what constitutes a sale. * * *

On the basis of the facts as outlined above, we are convinced that the transactions involved in the instant case had more actual and potential effect on petitioners than a mere reduction of their taxes. Petitioners were making a real economic investment, exposed themselves to risk of loss, and had reasonable expectations of reaping the benefits from appreciation of valuable assets. As such, we will recognize the transaction as a sale for tax purposes. Cf. *Knetsch v. United States,* 364 U.S. 361, 366 (1960).

In recognizing the occurrence of a sale by Branjon to the undivided interests, we must reject a number of positions respondent has taken. Respondent first argued that Branjon continued to own the property during the years at issue. He points to the fact that the undivided interests totally relied on the advice of Branton—Branjon's sole stockholder—Kahan, and Margolis in participating in the transaction, and thus, had no "effective" participation of their own. This argument deserves scant attention. The passive investor is a familiar figure in the business world, the individual who relies almost totally on investment counsel in handling his financial transactions. With his funds still at the risk of the enterprises in which he is directed to invest, however, we would find it totally unprecedented and unwarranted to deny to such investor the tax deductions the law affords to those owning property.

In this connection, respondent further points out that not only were the undivided interests entirely passive, but the sale of

to satisfy the undivided interests' out-of-pocket obligations relative to Fox, should be seen as a further "cushioning" of the parties' economic participation in respect of the property. Except in the cases of Levy and Pitt, however, the record of repayment of such loans is not insubstantial, and we are satisfied that the loans represented genuine indebtedness.

1964-65 and the resale of 1968 involved Branjon, the corporation wholly owned by one of their principal advisers, Leo Branton. The fact that Branton may be seen as having been involved on both sides of the transactions would give us more pause for thought if only Branton was advising the undivided interests. In both the 1964-65 and 1968 transactions, however, Margolis, and to a lesser extent Kahan, were asked by Branton to provide independent representation to the undivided interests. We think that such was in fact provided, and that the positions of the undivided interests were clearly protected.

In the December 1967 contract which revoked Lazarus' management responsibilities with respect to the Fox property, the parties—Branjon and Realty—refer to such property over which Lazarus had management powers as belonging to Branjon. In light of all the other facts in the record supporting ownership by the undivided interests, however, we think that such characterization in the 1967 contract should not be taken literally. For the purpose of the 1967 contract was to make it clear that Lazarus would no longer have the right to manage the Fox property through Realty's prior management contract with N & V. It was this corporation Branjon had liquidated in 1964, and whose contractual obligations were apparently thought by all parties to have become those of Branjon. Because of Branjon's contractual obligation to Realty, Lazarus did not have to care who owned the Fox property—all parties apparently thought it incumbent upon Branjon to secure a management contract from the purchaser which would allow Realty to continue its management function. As between Branjon and Realty, until the prior management contract was terminated, Branjon would always be considered as owning the property for the purposes of the management agreement. In any case, while the language in the termination agreement is troublesome, we do not think it reflects the actual ownership situation, and will not give it much weight.

Finally, in connection with his position that Branjon, and not the undivided interests, was the real owner of the improvements in the 1965 to 1968 period, respondent contends that the fact of the sale to Branjon in 1968 should cause us to ignore the original sale to the undivided interests in 1964. Were there evidence that the 1968 sale was preplanned in 1964, we would have to seriously consider respondent's step-transaction attack. However, in the instant case, we think it clear that it was intended in 1964 that

the undivided interests hold on to the improvements indefinitely in order that they might realize the benefits of the substantial hedge against inflation which the center would have provided in future years. The decision to sell in 1968, we think, was chiefly the result of Branton's desire to leave the country, and his own feeling that after he had so left—and he did in fact leave as planned—he would no longer be able to provide as close attention to the investment of his clients as he had been providing, and as he felt was his professional responsibility to provide. In addition, the shopping center had come under closer scrutiny from the IRS than the parties had expected. It thus seems clear to us that it would be unwarranted to disregard the sale to the undivided interests in 1964 because of the eventual sale to Branjon in 1968.

Respondent makes much of the fact that the undivided interests sold the improvements back to Branjon immediately after January 1968, the month in which taxable income was first generated. He focuses on this timing of the sale as evidence to support a conclusion that it had been preplanned that the interests hold the property only so long as tax losses were being generated. The evidence in the record, however, does not support respondent's characterization of January 1968, as the so-called "turn-around" month. As late as 1972, the property was continuing to demonstrate an ability to generate tax losses for its owners,[7] and estimates, whose reasonableness respondent does not contest, indicated at the outset of the transaction, in 1964, that the property would continue to generate tax losses until 1983. While petitioners have not provided us with the type of evidence undoubtedly available to them as to the performance of the shopping center over the remainder of 1968, we are sufficiently convinced that the figures for January were not representative of such performance. Rental receipts in 1967 totaled approximately $147,000, which was very close to the rental receipts' total for 1972. If January 1968 were representative of the center's 1968 performance, we would have to project rental receipts of somewhere in the vicinity of $400,000 for 1968—speculation which we simply cannot indulge. Thus, the actual timing of the sale to

---

[7] The Fox property generated $148,288 of rental income for the GMSZ partnership in 1972. The partnership claimed expenses, including depreciation, of only $85,758, but such expense figure excludes any interest component (GMSZ took a full deduction for the $200,000 interest paid on its 1971 return) or a rental component. The undivided interests would have had at least $150,000 of interest and rental expenses in 1972 had they owned the property, and thus, a significant sheltering effect would have still been present.

Branjon does not indicate to us the type of preplanned exit which respondent would like to have inferred.

Respondent next takes the position that Lazarus should be deemed the owner for tax purposes of the Fox improvements. He relies most heavily on our decision in *Simon M. Lazarus,* 58 T.C. 854 (1972), on appeal (C.A. 9, July 18, 1973). As described in our findings above, Lazarus, the original owner of the Fox property, had transferred the property to an irrevocable trust for his children in 1963, in exchange for what he termed an "annuity" of $75,000. In *Lazarus,* we held that there had been no sale to the trust and that Lazarus had not received an annuity. Rather, he had transferred the N & V stock (N & V held the shopping center property at that time) to the trust and retained a life interest in trust income. Thus, he was deemed to be owner of some portion of the trust corpus, under section 677(a). 58 T.C. at 873. Our decision, however, clearly gives no support to respondent's contention that Lazarus still owns the shopping center. For the trust contained only the note from WE, the trustee having sold the N & V stock to WE, as he was authorized to do under the trust instrument, soon after the transfer in trust by Lazarus. Thus, while we considered Lazarus for tax purposes as owning a portion of the trust, the trust itself no longer owned the N & V stock, and we can think of no way in which Lazarus, subsequent to the trust's sale to WE, could be considered for any purposes as owning the N & V stock.

Lazarus did try to assert a right to rescind the transfer in 1972. It was a short-lived assertion, however, and as all the parties involved at that time quickly decided, without any legal basis whatsoever.

Finally, respondent urges that we should take into account that Lazarus was still receiving, during 1965-68, substantial amounts of income generated by the shopping center. Some portion of the income generated by the shopping center, as described in our findings of fact above, flowed from the most recent purchaser, the undivided interests, back through all the intermediate purchasers of Fox—Branjon, AA, and WE—finally yielding the annuity payment to Lazarus. Respondent also points out that through Realty's management contract, Lazarus continued to exercise management functions with respect to the Fox property.

Our short answer to respondent's argument is that in *Commissioner v. Brown, supra,* the Supreme Court found it to be

no obstacle to its finding of a "sale" that the selling party retained management and income interests in the purchased assets. 380 U.S. at 569-570. Here, too, we find that Lazarus, despite his continuing management and income interest, had effectively parted with his ownership interest in the Fox property prior to the sale to the undivided interests.

Having found that the undivided interests were the owners of the Fox improvements during the period involved in the instant case, we next consider respondent's alternative position—that the basis and useful life chosen by petitioners in depreciating the Fox improvements were incorrect.

In the April 1964 contract between AA and Branjon, $3 million of the total selling price of $3.750 million, was characterized as principal. In depreciating the property, Branjon assumed a basis equal to the amount of the principal specified in the contract. After Branjon depreciated the property down to a basis of $2,918,274.50, it sold the property—improvements to the undivided interests, land to the partnership—and the undivided interests have claimed a basis for depreciation of $2,368,699.50, which is their estimate of what portion of the total basis of the Fox property is allocable to the improvements.

As to the 1964 contract with AA, petitioners have admitted that because of the substantial tax advantages to both Branjon and AA, a certain amount of what would ordinarily have been determined to be interest was capitalized in the agreement. Thus, since the August agreements represent, in effect, an assumption by the undivided interests of the terms and obligations of the April contract, it is clear that they too, under the August agreements, are attempting, without any justification whatsoever, to depreciate a basis composed in some part of capitalized interest.

Petitioners, however, point to the February 1965 agreement as salvaging their position. For by that agreement, they contend, sufficient interest was charged them to make it clear that the $3 million therein specified as the principal (as reduced by Branjon's depreciation) is clearly all depreciable basis.

Petitioners' own audit report, however, shows the lack of merit of this position. That report estimated that petitioners would have to pay approximately $1,768,878 of interest under the 1965 agreement, an amount exceeding the amount of interest they were required to pay under the 1964 agreements by approximately $1 million. But pursuant to Branjon's guarantees to them,

as contained in the 1965 agreement, they expected to receive over $1,100,000 from Branjon—effectively covering the excess "interest" they were being required to pay. The undivided interests were thus attempting to create an artificially inflated basis by including an extra, but illusory, amount of interest in the February 1965 agreement. Having done so they now claim that what they have characterized as principal in the contract was clearly fully depreciable, without an interest component, the latter having been amply provided for. Suffice it to say that we reject such attempt by petitioners.

In light of our finding that we can ignore the provision for additional interest under the 1965 contract, we next consider whether petitioners have shown any error in respondent's determination that the depreciable basis of the entire Fox property was only $1,575,000 (reduced by whatever depreciation Branjon properly took), which was Lazarus' estimate of the fair market value of the center in 1963. Since petitioners have introduced no evidence in this connection, we must hold for respondent on this issue.[8]

As described above, the undivided interests calculated their basis in the improvements as a percentage of the total basis of the entire Fox property—they determined that $2,368,699.50 of the total basis of $2,918,274.50 was allocable to the improvements. Respondent has not challenged the particular fractional share which the petitioners utilized in calculating their basis from the total basis of the Fox property, and it is this fraction which should be utilized in the Rule 155 calculations.

Respondent has also argued that the improvements should have been depreciated on the basis of a 33⅓-year useful life, and not the 19-year life chosen by petitioners. We uphold petitioners' position on this issue.

Kahan, petitioners' accountant, testified that it was his experience that the length of the major lease in a shopping center like Fox determines the useful life of the buildings in the center. When the major lease expires, a new building is normally put up by the major tenant with the satellite stores then following suit. We think Kahan, who has been an accountant for over 25 years, was a credible and well-informed expert witness whose testimony

---

[8] In *Simon M. Lazarus,* 58 T.C. 854, 860 (1972), on appeal (C.A. 9, July 18, 1973), we were able to find that the N & V stock, in April 1964, was worth $1,575,000 and that $1,425,000 of interest had been capitalized.

deserves substantial weight. Though the record is somewhat meager on this issue, we find that petitioner is entitled to depreciate the improvements on the basis of a 19-year useful life.

In his pretrial memorandum to this Court, respondent indicated that he would argue against the allowance of a deduction for the rent paid by the undivided interests to the partnership. Nothing further, however, has been heard from respondent on this issue either at the trial or in his briefs, and we consider him to have abandoned this position.

The final issue for our decision is whether respondent correctly asserted section 6653(a) penalties against petitioners because of an "intentional disregard of rules and regulations." Respondent does not claim that the petitioners were negligent. Because respondent assessed penalties for the 1965 and 1966 taxable years in amended answers, it is his burden to show the correctness of his action as to those years. Petitioner Hill, however, retains the normal taxpayer's burden of proof as to the penalty imposed on his 1967 return, which was properly assessed in a notice of deficiency. We find that respondent has failed to carry his burden as to the 1965 and 1966 penalties, but that petitioner Hill did carry his as to penalty assessed for 1967.

The petitioners relied totally on experienced attorneys and accountants in structuring their transactions and completing their income tax returns. The records of the transactions comprehending the purchase and sale of the Fox improvements were all kept by their accountant, Kahan, and he was fully apprised of all facts relevant to the transactions in question. Under such circumstances, we are unable to hold that petitioners were guilty of an intentional disregard of rules and regulations, *R. E. Nelson,* 19 T.C. 575, 581 (1952); *William A. Brown,* 47 T.C. 399, 410 (1967), affirmed per curiam 398 F. 2d 832 (C.A. 6, 1968), certiorari denied 393 U.S. 1065 (1969); *Leo A. Woodbury,* 49 T.C. 180, 200 (1967).

*Journal Co.,* 46 B.T.A. 841 (1942), reversed on another issue 134 F. 2d 165 (C.A. 7, 1943), upon which respondent placed major reliance in asserting the penalties, is distinguishable on its facts from the instant case. In that case, the petitioner was fully aware that in taking a certain credit, it was electing not to follow a regulation of respondent which had been judicially approved. Although the petitioner in *Journal Co.* did consult counsel, we were able to find in that case that petitioner gave full and

thoughtful deliberation to the question of whether or not it should comply with respondent's regulation. 46 B.T.A. at 845. In the instant case, petitioners, unversed in matters of tax and faced with highly complicated transactions, relied totally, and we think reasonably, on decisions made by their experienced advisers, a course of action which protects them from the imposition of a 6653(a) penalty under the cases we have cited above.

*Decisions will be entered under Rule 155.*