JOHN J. AND JUDY L. DEISHER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Deisher v. Commissioner
Docket No. 20382-88
United States Tax Court
T.C. Memo 1990-347; 1990 Tax Ct. Memo LEXIS 359; 60 T.C.M. (CCH) 77; T.C.M. (RIA) 90347; July 10, 1990, Filed *359 Decision will be entered under Rule 155. John D. Copeland and Andrea Winters, for the petitioners. William R. *360 McCants, for the respondent. COHEN, Judge. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency in and additions to petitioners' Federal income tax as follows: Additions to Tax Year
Deficiency
Sec. 6653(a)(1)
Sec. 6661
1983
$ 33,093
$ 1,654.65
$ 8,273.25
Respondent also determined that petitioners were liable for an addition to tax under section 6653(a)(2) and for additional interest under section 6621(c). Respondent has now conceded that petitioners are not liable for additional interest under section 6621(c). Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the year in issue, and all references to rules are to the Tax Court Rules of Practice and Procedure. The issues for decision are (1) whether Mrs. Deisher's receipt of $ 50,000 was a nontaxable gift or was includable in income; (2) whether $ 12,214.96 received by Mrs. Deisher was a loan or was income; (3) whether petitioners failed to report as income amounts received as salary from Mrs. Deisher's employer and a deposit to Mr. Deisher's bank account; and (4) whether *361 petitioners are liable for the additions to tax under sections 6653(a) and 6661. FINDINGS OF FACT Some of the facts have been stipulated, and the facts set forth in the stipulations are incorporated in our findings by this reference. Petitioners resided in Dallas, Texas, at the time the petition in this case was filed. Petitioners' Employment Background
During the early 1980's, petitioner John J. Deisher (Mr. Deisher) was regional vice president of the Federal National Mortgage Association (Fannie Mae) in Dallas. Fannie Mae is a federally chartered corporation organized by Congress to provide liquidity in the residential mortgage market. From 1966 to 1974, petitioner Judy L. Deisher (Mrs. Deisher) was an executive secretary at Fannie Mae. In 1974, petitioners were married, and Mrs. Deisher quit her job at Fannie Mae to become a homemaker. Two years later, Mrs. Deisher became a teacher's aide at her children's middle school. In 1981, petitioners were invited to a dinner party where Mrs. Deisher first met Danny Faulkner (Faulkner), a real estate developer in Dallas. Mr. Deisher had met Faulkner on prior occasions. During the course of the evening, Faulkner offered *362 Mrs. Deisher employment with his Faulkner Point Sales Center (Faulkner Point). A few weeks later, Mrs. Deisher went to Faulkner Point and, in February 1982, she began part-time employment showing condominiums to prospective purchasers. She was to be paid on a commission basis, but she did not sell any condominiums. In October 1982, Faulkner hired Hazel Murray to handle the marketing of the newly formed Faulkner Communities Advertising, and Mrs. Deisher became secretary and office administrative assistant at Faulkner Communities Advertising, earning between $ 1,000 and $ 1,200 per month. In August 1983, Mrs. Deisher began working for Peak Investments Corporation (Peak), a condominium development corporation. Faulkner Communities Advertising continued to pay her indirectly through checks written to Peak. From January through July 1983, she received 13 checks, totaling $ 19,250, payable to her from Faulkner Communities Advertising. Another $ 10,000 was paid by Faulkner Communities Advertising to Peak and then paid to Mrs. Deisher. Faulkner's Projects and Fannie Mae
Faulkner had a development project in Texas referred to as the I-30 condominium project. In the early 1980's, *363 condominium developers commonly acquired a source of "end loans" for condominium purchasers. Availability of such financing would facilitate sales of the condominiums. One way to assure a supply of end-user loans was to have a lender submit an application and required documentation to Fannie Mae in advance of completion of the project. This procedure helped to ensure that (1) the project was completed in accordance with the specifications; (2) all loan documents conformed with the specifications; and (3) all loan documents conformed with Fannie Mae requirements. If, at that point, the economics of the project were appropriate, Fannie Mae would commit to purchase, from the originating lender, mortgage loans made to condominium purchasers. Many of the condominium projects on the I-30 corridor were submitted to and were approved by Fannie Mae for purchase of end-user loans. Fannie Mae approval of Faulkner's projects was beneficial because it made mortgages of condominiums developed by him marketable in the secondary mortgage market. There were also secondary mortgage markets accessible through the Veterans' Administration and the Federal Housing Administration. In passing on *364 a request for approval of end loans in a project, Fannie Mae used the 70-percent presale rule and the 20-percent maximum sales to investors rule. The 70-percent presale rule was merely an informal gauge wherein Fannie Mae desired to have 70 percent of the units presold before it would purchase any of the end loans. The concept was that, if 70 percent of the units were sold, then the project was likely to produce enough occupants to pay assessments to provide for maintenance and upkeep of the project through the owner's association. The 20-percent maximum sales to investors rule was designed to assure that most of the occupants would be owner-occupants as opposed to lessees. Fannie Mae perceived owner-occupants as having a pride of ownership in the units providing maintenance and upkeep and maintaining a low turnover rate. None of the Faulkner projects submitted to Fannie Mae in 1982 and 1983 met the institution's 70-percent presale rule or the 20-percent maximum sales to investors rule. By the summer of 1983, it was clear that no further approvals were forthcoming and, later in 1983, prior conditional approvals were withdrawn. Petitioners' Involvement in Faulkner's Projects
*365 In 1982, Mr. Deisher was in attendance at a meeting between representatives of Empire Federal Savings and Loan Association (Empire) and Fannie Mae. At that meeting, the representatives of Empire requested that Fannie Mae consider changing the presale requirements on certain Faulkner projects. Changing presale requirements could be accomplished by members of the staff quality control section as well as by the underwriters. Fannie Mae requested that Empire submit documentation in support of the requested change. Some incomplete documentation was submitted prior to the Fannie Mae withdrawal of approval of the Faulkner condominium projects in 1983. Mr. Deisher supervised those employees who could have made decisions to benefit Faulkner and Faulkner's I-30 development plans; however, Mr. Deisher would, by his own estimate, have to exert influence over 13 persons in order to change presale requirements or perform any favor. Mrs. Deisher purchased a condominium unit in the I-30 project on August 27, 1982, for $ 49,500 with a $ 2,500 down payment and a $ 47,000 1 - year balloon mortgage. The loan was financed by Empire. Mrs. Deisher's purchase occurred between the time the project *366 was conditionally approved on August 18, 1982, and the date the project was finally approved by Fannie Mae on September 10, 1982. Mrs. Deisher was a 50-percent owner of Sky-Tract, Inc., a corporation that was developing condominiums in the I-30 corridor. Mrs. Deisher and the other investors in Sky-Tract assumed personal liability on an interim construction loan of $ 1,056,000 and a land loan of $ 691,628. Ernie Hughes (Hughes), president and owner of Peak, and Mrs. Deisher invested in a riverboat that was to be the major recreational attraction of the I-30 corridor condominium development. Mrs. Deisher held a 3.3-percent interest, equivalent to $ 17,300, and she was liable for that portion of a $ 550,000 loan financed by First Bank of Rowlett. Hughes and Mrs. Deisher were also involved in ownership of a hotel. Mrs. Deisher, Hughes, and the other investors financed the purchase of the hotel with a $ 12,800,000 loan from Evangeline Federal Savings and Loan and a $ 1,200,000 second mortgage from Great Texas Development. On November 22, 1983, Mr. Deisher signed the hotel partnership agreement as spouse of Mrs. Deisher. Both petitioners were guarantors of the $ 12,800,000 note. *367 Mrs. Deisher contributed $ 10,000 to the hotel venture. That amount was returned to her 10 days later. Finally, Mrs. Deisher and Hughes were involved in Bradford Builder, Inc. (Bradford Builder). Bradford Builder was a Texas corporation that was formed on March 18, 1983. Bradford Builder was owned equally by Mrs. Deisher and Emerson Moore (Moore). Bradford Builder's initial director and incorporator was David Centrell who, along with Hughes and through Gold Eagle Investments, Inc. (Gold Eagle Investments), put together the investor groups for the Lighthouse Landing projects. Hughes was also a principal in Gold Eagle Investments. Bradford Builder was one of nine builder/investor/developer groups that were owners of approximately 17 acres in a planned development called Lighthouse Landing. Lighthouse Landing was to be a luxurious lakeside town house development in the City of Rockwall. Peak, another company owned by Hughes, was the general contractor on the project. Peak planned to sell the nine separate tracts of land to nine investor groups and then operate on a "turnkey" basis and take care of all the architectural planning, developing, marketing, and sales for the project. *368 Mrs. Deisher did not look at the land Bradford Builder was buying prior to the purchase, did not negotiate the sales price, and did not know the project's principal planner or developer. Further, she did not know whether Bradford Builder had filed Federal income tax returns, kept corporate records, or had a bank account, corporate seal, or stationery. On March 21, 1983, Mrs. Deisher signed a note payable for $ 12,214.96 to Bradford Builder. The terms of the note called for a principal payment in full on March 21, 1988, with no stated interest, and, if the principal amount was not satisfied at that time, then interest would accrue at a rate of 10 percent per year. No collateral was given for the note, and no loan application was executed. On April 1, 1983, Mrs. Deisher received a check from Gold Eagle Investments payable to her for $ 12,214.96 bearing the notation "Light House Tr. #3." On the same day, Moore received a check for the same amount. These funds were used to induce investors into contributing capital to the project. Mrs. Deisher never repaid the amount due to Bradford Builder. The Lighthouse Landing properties were not developed because the City of Rockwall rejected *369 the final plan. When Peak discovered that the deal would not go through as planned, a land swap was initiated with Faulkner, Jim Toller, and the lender on the project. The land swap relieved the builder/investors, including Bradford Builder, of their obligations in the Lighthouse Landing deal. On November 15, 1984, Bradford Builder ceased to exist. Bradford Builder never acquired a Federal tax identification number or filed Federal income tax returns. The $ 50,000 "Gift"
Faulkner had a reputation for extravagance and bragged that he had bought certain Federal, State, and local government officials who would help him in his land dealings. In 1982, Mrs. Deisher received two gold Rolex watches; one was for her, and the other was for her husband. Other employees of Faulkner also received gold Rolex watches. Each watch was worth between $ 4,000 and $ 5,000. At a Christmas party in 1982, Faulkner presented mink coats to Mrs. Deisher, Hazel Murray, and 16 other people. Each mink coat had an estimated value of between $ 7,000 and $ 12,000. Other employees of Faulkner were given diamond stickpins. Petitioners did not consider Faulkner to be a close friend. They did not *370 invite Faulkner to their home for dinner or otherwise entertain Faulkner. Mrs. Deisher's main contact with Faulkner was through her employment. Petitioners dined with Faulkner four or five times during 1982 and 1983 where other persons were present and Faulkner paid for the meals. On January 14, 1983, Mr. Deisher hosted a surprise 40th birthday party for his wife. One of the guests at the party was Faulkner. At the party, Faulkner stood up and announced that Mrs. Deisher had always wanted a Mercedes-Benz car and now she would have one. Mrs. Deisher was surprised by the announcement. Faulkner told Mrs. Deisher to go to a dealership and pick the car that she wanted. After he made the announcement, Faulkner stated that Mrs. Deisher was a great lady, a good employee, that he appreciated her and she brought class to his operation. After Faulkner made the announcement, he financed the purchase of the car with the profit he derived in a real estate transaction in which he caused transfers of a piece of land, initially valued at $ 104,027, four different times on the same day, ultimately garnering a gross sales price of $ 580,641.73. Mrs. Deisher selected a car and was told by *371 Faulkner to tell the salesperson to contact someone at First Bank of Rowlett regarding payment for the car. Approximately 2 weeks after she chose a car, Mrs. Deisher was given a cashier's check for $ 50,000. She did not know the source of the funds provided to her by Faulkner. She deposited the $ 50,000 check at her bank and purchased a cashier's check for $ 47,984.08, the purchase price of the car. On February 1, 1983, Mrs. Deisher delivered the check to a Mercedes-Benz dealership and took possession of the car. Petitioners discussed the possible perception of impropriety of accepting the car from Faulkner and concluded that they had not done anything improper. Faulkner did not file gift tax returns for 1982 and 1983. Mrs. Deisher did not receive a Form 1099 for the $ 50,000. Petitioners' Income Tax Return
In 1983, Mrs. Deisher reported $ 27,250 as wages and $ 7,727 as commission income received from Sky-Tract as "front end money." Petitioners did not, however, report the $ 12,214.96 received from Bradford Builder for the same purpose. Petitioners did not report the $ 50,000 received from Faulkner. Petitioners advised their Federal income tax return preparer of *372 the receipt of the $ 50,000 from Faulkner and provided him with information about their income, including a representation that Mrs. Deisher received a total of $ 27,500 from Faulkner Communities Advertising and a $ 2,500 "bonus" from Peak. Their preparer advised them that the receipt of the $ 50,000 was properly treated as a gift. Petitioners also informed their preparer of the receipt of $ 7,727 from Sky-Tract. Their preparer advised them that that amount was properly includable in income. Petitioners did not, however, inform their preparer of the receipt of $ 12,214.96 front end money or the note to Bradford Builder. In January 1983, petitioners deposited a $ 1,000 check from First Bank of Rowlett into Mr. Deisher's bank account at Cullen/Frost Bank of Dallas. Petitioners deducted $ 500 as commission expense on Schedule E of their income tax return. Respondent determined that petitioners (1) had not shown that the $ 500 commission expense deduction they claimed on their Schedule E was a commission and paid; (2) had unreported income totaling $ 65,215, comprised of the $ 50,000 received from Faulkner, $ 12,214.96 received from Bradford Builder, $ 2,000 additional salary *373 from Faulkner Communities Advertising, and the $ 1,000 deposit into Mr. Deisher's account. Epilogue
Faulkner was subsequently charged with various crimes involving fraud in the acquisition of financing for the I-30 condominium projects and was not available to testify in the present case. On September 12, 1988, petitioners filed a petition for bankruptcy in the United States Bankruptcy Court for the Northern District of Texas. The note to Bradford Builder was not scheduled as a liability on any of the bankruptcy filings. OPINION Petitioners bear the burden of proof with respect to the issues in this case. Rule 142(a). Respondent determined that petitioners had failed to substantiate their claimed $ 500 commission expense deduction. Petitioners presented no evidence on this issue and are deemed to have conceded that amount. See Rule 149(b). Unreported Income or Gift
Section 61(a) provides that gross income for tax purposes includes income from whatever source derived. Section 102(a) provides that gross income does not include the value of property acquired by gift. *374 Petitioners argue that the $ 50,000 was a gift. Respondent contends that the $ 50,000 was properly includable in gross income. The existing case law addressing the distinction between a gift and income is extensive. The starting point for any analysis is Commissioner v. Duberstein, 363 U.S. 278 (1960), where the issue was whether an automobile was taxable income or a nontaxable gift to the recipient. The automobile was not solicited by the recipient but was provided to him by a business associate who was grateful for customers referred to him by the recipient. The Supreme Court analyzed the existing case law and the relevant statutory provisions are dated: The course of decision here makes it plain that the statute does not use the term "gift" in the common-law sense, but in a more colloquial sense. This Court has indicated that a voluntary executed transfer of his property by one to another, without any consideration or compensation therefore, though a common-law gift, is not necessarily a "gift" within the meaning of the statute. For the Court has shown that the *375 mere absence of a legal or moral obligation in make such a payment does not establish that it is a gift. Old Colony Trust Co. v. Commissioner , 279 U.S. 716, 730 [(1929)]. And, importantly, if the payment proceeds from "the constraining force of any moral or legal duty," or from "the incentive of anticipated benefit of the economic nature, Bogardus v. Commissioner, 362 U.S. 34, 41 [(1937)], it is not a gift. And, conversely, "[w]here the payment is in return for services rendered, it is irrelevant that the donor derives no economic benefit from it." Robertson v. United States , 349 U.S. 711, 714 [(1952)]. A gift in the statutory sense, on the other hand, proceeds from a "detachedanddistinterestedgenerosity," Commissioner v. Lobue, 351 U.S. 243, 246 [(1956)]; "out of affection, respect, admiration, charity or like impulses." Robertson v. United States, supra, at 714.And in this regard, the most critical consideration, as the Court was agreed in the leading case here, is the transferor's "intention." Bogardus v. Commissioner, 302 U.S. 34, 43 [(1937)]. *376 "What controls is the intention with which payment, however voluntary, has been made." Id. at 45 (dissenting opinion). [Commissioner v. Duberstein, 363 U.S. at 285-286; emphasis added; fn. refs. omitted.]
The Supreme Court concluded that the determination of whether what was called a gift by the parties was not taxable income was to be tested by objective criteria. 363 U.S. at 286-288. We must decide whether Faulkner transferred $ 50,000 to Mrs. Deisher out of "detached and disinterested generosity." Unfortunately, we do not have Faulkner's testimony about his intent in providing the funds to Mrs. Deisher. Given the Supreme Court's analysis in Duberstein and the circumstances surrounding this case, we would not give Faulkner's testimony determinative weight. Our focus, therefore, is upon other factors and evidence of his intent. Respondent initially contends that Faulkner was motivated by Mrs. Deisher's employment status. Respondent cites Duberstein for the proposition that "it doubtless is, statistically speaking, *377 the exceptional payment by an employer to an employee that amounts to a gift." 363 U.S. at 287.Although respondent has correctly quoted the language, the context in which the Supreme Court spoke is significant. The quote is part of a discussion by the Supreme Court wherein it rejects a gift or income test proposed by the Government in which truisms, such as the one quoted by respondent and inferences, such as those made when a transferor takes a deduction for a purported gift, are made conclusive. 363 U.S. at 287. Petitioners cite Kralstein v. Commissioner, 38 T.C. 810 (1962); Johnson v. Commissioner, 48 T.C. 636 (1967); Romero v. Commissioner, T.C. Memo. 1967-157; Abdella v. Commissioner, T.C. Memo. 1983-616; Runyon v. Commissioner, T.C. Memo. 1984-623; and Hunley v. Commissioner, T.C. Memo. 1966-66, for the proposition that the transaction at issue was a gift. Respondent contends that all of petitioners' cited cases are factually distinguishable from the present case. In Kralstein v. Commissioner, supra, the taxpayers *378 received money from various persons and entities who paid the amounts in connection with a testimonial dinner given for the taxpayer-husband, a retiring union vice president. This Court allocated the funds received by the taxpayers according to whether or not the contributors gave the funds with a dominant reason of detached and disinterested generosity. Kralstein v. Commissioner, 38 T.C. at 817.The Court allocated to taxable income amounts received from persons who: participated for reasons wholly apart from any donative intent toward petitioner. These persons agreed to participate, as indicated above, primarily for a variety of business reasons. They anticipated, whether rightly or wrongly, that some benefit (whether specifically contemplated or of some undefined nature) might result to their individual businesses from such participation, or that failure to participate might have some unfavorable business consequences to them. * * * [Kralstein v. Commissioner, 38 T.C. at 818.]
In Johnson v. Commissioner, supra, the taxpayer was a fireman who performed gardening services for a wealthy retired cattleman-rancher. *379 The taxpayer was paid a daily wage and reported the income as wages. The taxpayer was also paid amounts by check in excess of his daily wages that bore the notation "gift" or "loan." Testimony revealed that the retired cattleman-rancher, Robinson, was very fond of the taxpayer and the taxpayer's newly burgeoning family and wanted to share the wealth he had accumulated with one who was kind and helpful to him. Applying the Duberstein analysis, this Court concluded that the amounts received by the taxpayer in excess of the amounts attributable to the taxpayer's daily wages were gifts, amounts given with a dominant reason of detached and disinterested generosity. In Romero v. Commissioner, supra, the taxpayer was a checker at a supermarket where Robinson often did his shopping. From 1955 through 1959, Robinson often gave Romero money, commenting that he could not take it with him and that he wanted to help her. These amounts were gifts. In 1959, Robinson hired Romero as a part-time housekeeper. In 1959, Romero received $ 17,950 of which, the parties stipulated, $ 7,950 represented wages includable in income. The Court concluded that the remaining $ 10,000 *380 represented either loans or gifts but, in light of Robinson's relationship with Romero and the documentation and testimony surrounding the $ 10,000, bore no relationship to her employment. In Abdella v. Commissioner, supra, two principal shareholders of a coal sales company, who were also tax attorneys, sold their stock in the company; each made a profit of over $ 4,000,000. Those two shareholders each paid $ 15,000 to the taxpayer, a valuable employee of the corporation in which the shareholders held their interests. When the taxpayer asked their advice as to the tax treatment of the funds, both shareholders assured him that he should treat the amounts as a gift. Subsequently, both shareholders deducted the $ 15,000 payments. This Court concluded that the shareholders were under no legal or moral obligation to share the proceeds of their sale of stock with the taxpayer. We concluded that moral obligation or duty as contemplated by Duberstein involves an unenforceable promissory obligation where the recipients expect the payments or payors expect to receive future benefits. Therefore, the payments to the taxpayer were nontaxable gifts. In Runyon v. Commissioner, supra, *381 this Court addressed the same issue raised in Abdella involving the same two shareholders and a former employee, except, in Runyon, the payments were in $ 5,000 increments. In Runyon, we again held that there was no legal or moral obligation on the part of the shareholders to make the payments. Further, we concluded that the employee was an employee of the corporation but was never an employee of the two individuals and, therefore, had no reason to expect the payments. Accordingly, we concluded that the amounts were gifts. Finally, in Hunley v. Commissioner, supra, the taxpayer obtained stock at a price below its fair market value because the offeror of the stock perceived the taxpayer to be someone who could assist his business by allowing publication of his name as a shareholder. In applying the Duberstein analysis, the Court found that the taxpayer neither knew nor should have known that he was getting a bargain purchase and that the transferor had no reasonable basis for an expectation that the taxpayer would render any assistance. Therefore the bargain sale could not be considered an inducement to future service or otherwise taxed as *382 compensation. Petitioners initially argue that Kralstein supports their position that Faulkner provided the $ 50,000 to Mrs. Deisher out of a mixture of admiration and respect for her and with a desire to gain social standing or respect as a result of being known as a lavish giver. Petitioners argue that there was no business interest Faulkner could advance and that Faulkner could not expect any business benefit from Mr. Deisher or fear any unfavorable business consequences for failure to give Mrs. Deisher the $ 50,000. Mrs. Deisher was hired as an employee of Faulkner's at a dinner party where both petitioners were present. At the time Faulkner hired Mrs. Deisher, he knew that Mr. Deisher was a high-ranking official at Fannie Mae. Faulkner had development projects where Fannie Mae approval was advantageous. Faulkner often boasted of his control over public officials. Petitioners invested in Faulkner's I-30 projects. We conclude on this record that Faulkner had an expectation of receiving future benefits when he provided Mrs. Deisher with the $ 50,000 and that the facts are thus comparable to those leading to allocation of receipts to taxable income in Kralstein *383 . Petitioners next contend that the present case is similar to Johnson and Romero because Faulkner was merely sharing his wealth with those he cared for as a means of enhancing his personal reputation and not because of any expectation of business advantage. The evidence in the present case does not support that assertion. Petitioners testified that they did not consider Faulkner a close friend and had rarely socialized with him. Further, the testimony establishes that Faulkner gave money and valuable items to others in an attempt to promote his business interests. Cf. Hornung v. Commissioner, 47 T.C. 428, 438-439 (1967). Petitioners next assert that Abdella and Runyon control the outcome of this case. Petitioners contend that neither a legal nor moral obligation was present in the instant case and, accordingly, they should be afforded gift treatment. Petitioners' reliance on Abdella and Runyon is misplaced. In the present case, we have concluded that Faulkner had an expectation of receiving future benefits, whether or not it was justified from petitioners' perspective. Finally, petitioners rely on Hunley for the assertion *384 that they were not induced to take action in the future because they did not know that Faulkner provided the funds to Mrs. Deisher with the expectation of obtaining future benefits. Although they may have been surprised by the gift itself, petitioners were aware that they were receiving $ 50,000. Mr. Deisher testified that he and his wife discussed the propriety of accepting the automobile and, in hindsight, regrettably accepted it. Further, subsequent to receiving the car, petitioners invested in Faulkner's projects and guaranteed substantial liabilities relating to them. We are not persuaded on this record that Faulkner gave Mrs. Deisher $ 50,000 out of detached and disinterested generosity. The $ 50,000 represents unreported income. Bradford Builder Note
Respondent contends that the $ 12,214.96 that Mrs. Deisher received in the form of a loan constituted income to petitioners. A loan from a closely held corporation requires close scrutiny. Haber v. Commissioner, 52 T.C. 255, 266 (1969). affd. 422 F.2d 198 (5th Cir. 1970). Mrs. Deisher executed *385 a note to Bradford Builder. There was no collateral for the note. There was no fixed schedule of payments; the note called for repayment at the end of a 5-year term. The note bore no interest unless repayment was not made at the end of the 5-year term. The loan amount was not repaid. Bradford Builder did not keep books and records. Bradford Builder was incorporated for one transaction. When the Lighthouse Landing deal fell through, Bradford Builder went out of existence. Bradford Builder did not have a Federal tax identification number and never filed corporate returns. Moore, the other 50-percent shareholder in Bradford Builder, received a check for the same amount as Mrs. Deisher. Mrs. Deisher labeled the money she received from Bradford Builder as "front end money." That money was used to entice investors into Faulkner's projects. Petitioners did not tell their income tax preparer of Mrs. Deisher's receipt of the $ 12,214.96. Petitioners did not inquire as to the proper tax treatment of those funds despite telling their preparer of the front end money they received from Sky-Tract and receiving his advice to report the amount received as commission income. Although petitioners *386 filed for bankruptcy in 1988, they did not individually list the Bradford Builder note as a liability. All of the foregoing facts lead us to conclude that the note executed by Bradford Builder was merely a pretense and the funds Mrs. Deisher received were never intended to be repaid. The $ 12,214.96 represents unreported income. Unreported Earnings and Unexplained Deposit
Respondent determined that Mrs. Deisher had income from Faulkner Communities Advertising for 1983 totaling $ 29,250 and an unexplained $ 1,000 deposit into Mr. Deisher's account at Cullen/Frost Bank of Dallas that is not accounted for on petitioners' Federal income tax return. Petitioners reported $ 27,250 as received from Faulkner Communities Advertising. Petitioners contend that there is only a $ 1,000 discrepancy between petitioners' computation of the amount they received and reported and respondent's computation of the amount they should have reported. Further, petitioners offer to concede that their income should be adjusted $ 500 to reflect this error. The evidence establishes that Mrs. Deisher received $ 29,500 from Faulkner Communities Advertising. Petitioners have not denied that they received *387 an additional $ 1,000 in January 1983. Petitioners argue that $ 2,500 of the disputed $ 3,000 was reported on a Schedule C, but they have not presented any logical explanation or persuasive documentation of that claim. The information they sent to the preparer listed $ 2,500 as a "bonus" from Peak, but they have not proven that this is the same as amounts otherwise included in respondent's computation. Petitioners have not met their burden of proving that respondent's determination was erroneous. Negligence
Section 6653(a)(1), for the year in issue, provides for an addition to tax equal to 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of the rules or regulations. Section 6653(a)(2) provides for a further addition to tax equal to 50 percent of the interest due on the portion of an underpayment attributable to negligence. For the purposes of section 6653(a), negligence is the lack of due care or the failure to do what a *388 reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985).Generally, the addition to tax for negligence is not imposed where a taxpayer's positions are taken in good faith and based on advice of a competent tax expert. Otis v. Commissioner, 73 T.C. 671, 675 (1980), affd. without published opinion 665 F.2d 1053 (9th Cir. 1981). Mrs. Deisher testified that petitioners provided their Federal income tax return preparer with the relevant information regarding the $ 50,000 and that he advised her that it need not be reported as income. We have no basis for rejecting Mrs. Deisher's testimony on this point. Petitioners are therefore not negligent as to the receipt of the $ 50,000. Petitioners advised their preparer that Mrs. Deisher received only $ 27,500 from Faulkner Communities Advertising. They do not deny that the $ 1,000 deposit in January 1983 is additional income, and they have not explained the disallowed $ 500 commission expense. They have failed to persuade us that these items are not due to negligence. With respect to the loan from Bradford Builder, we affirmatively *389 conclude that petitioners were negligent. Petitioners did not disclose the alleged loan to their return preparer. Mrs. Deisher was involved in a similar transaction that she revealed to their preparer, who advised petitioners to report the amount as commission income. All of the facts surrounding the transaction indicate there was no real debtor-creditor relationship. Accordingly, petitioners are negligent with respect to the Bradford Builder transaction. In summary, the addition to tax under section 6653(a)(1) is to be computed on the total underpayment, and the addition to tax under section 6653(a)(2) is not to include the portion attributable to the $ 50,000 item. Substantial Understatement
Section 6661, for the year in issue, provides an addition to tax equal to 25 percent of the underpayment of tax attributable to a substantial understatement of income tax. Sec. 6661(a). Section 6661(b)(2)(B) provides for a reduction of the amount of the understatement by that portion of the understatement that is attributable to the tax treatment of any item if there is or was substantial *390 authority for such treatment. In Antonides v. Commissioner, 91 T.C. 686 (1988), affd. 893 F.2d 656 (4th Cir. 1990), we set forth the following analysis to be applied in determining whether a taxpayer has substantial authority for a position: In evaluating whether a taxpayer's position regarding treatment of a particular item is supported by substantial authority, the weight of authorities in support of the taxpayer's position must be substantial in relation to the weight of authorities supporting contrary positions. Sec. 1.6661-3(b)(1), Income Tax Regs. * * * * * * The weight of the authorities for the tax treatment of an item is determined by the same analysis that a court would be expected to follow in evaluating the treatment of the item. Thus, an authority is of little relevance if it is materially distinguishable on its facts from the facts of the case at issue. Sec. 1.6661-3(b)(3), Income Tax Regs. [91 T.C. at 702-703]
When all of the facts of the *391 present case and the authorities are considered, petitioners' treatment of the $ 50,000 was without substantial authority. Petitioners do not argue that there was substantial authority for their failure to include in income the amount Mrs. Deisher received from Bradford Builder, the amounts they failed to include in income from Faulkner Communities Advertising, their failure to include the $ 1,000 deposit, or their unsubstantiated $ 500 commission expense deduction. Accordingly, there can be no reduction of the underpayment subject to section 6661. To reflect the foregoing, Decision will be entered under Rule 155.